**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas ANDREWS, a/k/a Tank Andrews, Beverly Stokes, Ollie Tatum and Alvin Royster, Defendants-Appellants.**

No. 83–7698.

United States Court of Appeals,
Eleventh Circuit.

July 22, 1985.

Rehearing and Rehearing En Banc
Denied Aug. 22, 1985.

**1494**

Thomas Haas and Christopher Knight, Mobile, Ala., for Andrews.

Ronnie Keahey, Grove Hill, Ala., for Stokes.

Windell Owens, Monroeville, Ala. (Court-appointed), for Tatum.

N.P. Callahan, Jr., Birmingham, Ala. (Court-appointed), for Royster.

Jeff Sessions, III, U.S. Atty., Ginny S. Granade, Asst. U.S. Atty., Mobile, Ala., and Mervyn Hamburg, Dept. of Justice, Appellate Sec., Washington, D.C., for U.S.

Before VANCE and JOHNSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Thomas Andrews, Beverly Stokes, Ollie Tatum and Alvin Royster appeal from their conviction for conducting illegal traffic in food stamps, in violation of 18 U.S.C.A. § 371 and 7 U.S.C.A. § 2024(b). Because we find no merit in any of their claims, we affirm.

## I. STATEMENT OF THE CASE

### A. The Facts

In September 1982, Tommy Johnson, a Mobile County police officer, arrived in Monroe County to participate with the Monroe County Sheriff's Office in an undercover operation. He was introduced to an informant, Irving Lee, and instructed to assume the identity of "Tim Richardson," a dealer in stolen goods. Following a briefing on September 8, 1982, Lee and Johnson drove to appellant Andrews' home in Monroeville. Lee introduced Johnson to Andrews, who asked Lee what kinds of items he had available. Lee stated that Johnson had food stamps. Andrews expressed an interest in acquiring food stamps, if they could not be traced, were not marked, and were intact within food stamp books. Johnson said that these conditions could be

met, and that the stamps could be sold at approximately half of their value. No sale occurred on that day, but Johnson agreed to meet Andrews the next day at Andrews' house.

The next day the two resumed negotiations over the transfer of food stamps; the conversation was recorded by Johnson through the use of a body recorder. Andrews left to make a phone call, and soon after his return, the conversation was interrupted by the arrival of a woman, later identified as appellant Stokes. Andrews went to her car, conversed with her for a few moments, and emerged from the car with $200, which he gave to Johnson in partial payment for food stamps. Andrews agreed to meet Stokes an hour later, and she left. He subsequently assured Johnson that she could be trusted, and the two discussed a further transfer of food stamps. Andrews gave Johnson the remainder of the payment later that day, and subsequently received $500 worth of food stamps. Stokes was introduced to Johnson on September 22, 1982, at the fish market owned first by her husband and subsequently by Andrews. Andrews told Stokes that Johnson was his associate, that he would return the next day with food stamps and that she should "take care of" him.

On October 2, 1982, Andrews introduced Johnson to appellant Royster, then deputy sheriff of the Monroe County Sheriff's Office. Royster had previously told Andrews that he wanted to acquire a cassette radio; Johnson provided him with one, which he said was "hot" but had come from a distant location. When Johnson refused payment for the radio, Royster told Johnson to contact him if he ever had trouble in the area and Royster would do what he could to assist him. On January 10, 1983, Johnson, once again equipped with a body recorder, went to Royster's house to ask whether Royster would provide an escort for Johnson while he drove a stolen vehicle through Monroe County. Johnson told Royster that he had access to food stamps, which he had sold to Andrews at half price, and offered to make part of his payment to Royster in food stamps. Johnson added that it would

not be necessary to advise Andrews that he had bought the food stamps; Royster replied that Andrews was being watched by the Sheriff's Office. On January 13, 1983, Royster escorted Johnson through Monroe County. In return for this service, Johnson gave Royster $200 in cash and $200 worth of food stamps.

Johnson transferred food stamps on several subsequent occasions to Andrews, who was sometimes accompanied by codefendant Vickie Mims. On January 25, 1983, Johnson and Andrews met to negotiate a transfer. They were driving together to the Prouty Realty Company when they saw appellant Tatum in another car on the street. Andrews stopped and left the car to talk to Tatum; all three men then drove to Stout Realty Company, Tatum's place of employment. After a brief stay there, Andrews and Johnson proceeded to the Prouty Realty Company. There Andrews entered the building and returned to the car with $300, which he gave to Johnson in exchange for $695 worth of food stamps.

On January 31, 1983 and February 1, 1983, Johnson met Andrews at Stokes' house. On both occasions they proceeded, after initial negotiations, to the Prouty Realty Office where Andrews used the phone. On February 1, however, the two returned from the realty office to Stokes' home. Andrews took $200 worth of food stamps from Johnson and entered the house. Johnson left the car, walked up to the house and peered into the window. From this position, he saw Andrews hand the stamps to Stokes and receive a sum of money from her. Johnson returned to the car, after which Andrews exited the house and gave Johnson $100 in cash and one $50 book of stamps.

Andrews then directed Johnson to drive to Tatum's house, where Andrews got out of the car and knocked on a door adjacent to the carport. Tatum answered the door and the two conversed, following which Andrews returned to the car and asked Johnson for $600 worth of food stamps. When Johnson gave him food stamps valued at $630, Andrews returned to the door.

From the car, Johnson saw Andrews give the food stamps to Tatum, and receive from Tatum a sum of money. Andrews then walked back to the vehicle and gave Johnson $300 in cash.

On February 21, 1983, Johnson went to Royster's house to ask him for a .357 magnum pistol. Royster said it would be difficult to get because the sheriff had ordered all confiscated weapons to be surrendered to the office, but he promised to try. Johnson gave Royster $105 worth of food stamps as "down payment" on the weapon. Later that day, Johnson called Royster and told him he would accept a sawed-off shotgun as a substitute for the pistol. Royster said he thought he could arrange it. On March 2, 1983, Johnson went to Royster's house to inquire about the weapon. Royster told Johnson he could find the shotgun at Andrews' house. Johnson subsequently met Andrews at a grocery store parking lot, and the two proceeded to Andrews' home. Andrews entered and brought out a shotgun. Johnson took the gun and drove to Royster's house, where he paid Royster $145 in food stamps.

### B. Course of Proceedings

An eleven-count indictment filed in the United States District Court for the Southern District of Alabama charged appellants Andrews, Stokes, Royster, Tatum and co-defendant Vickie Mims (who subsequently pled guilty) with conspiracy to acquire and use food stamps illegally (count 1) and with the completed substantive offenses (counts 2–11), in violation of 18 U.S.C.A. § 371 and 7 U.S.C.A. § 2024(b). Counts 1 and 4 were dismissed and, following an unsuccessful motion for severance by appellants Stokes and Royster, appellants proceeded to a joint jury trial on the remaining counts. Appellants were convicted on all counts in which they had been charged (Andrews on seven; Stokes on two; Tatum on one; and Royster on three). This appeal followed.

## II. GROUNDS OF APPEAL

### A. Joinder and Severance

Appellants Stokes, Royster and Tatum argue that their joinder in a single indict-ment and their trial with appellant Andrews violated Fed.R.Crim.P. 8(b) (joinder of multiple defendants) and Fed.R.Crim.P. 14 (severance). Because alleged violations of Rule 8(b) and Rule 14 must be evaluated under different standards, these claims will be individually examined.

#### 1. Joinder

Rule 8(b) allows joinder of two or more defendants if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." *United States v. Russell*, 703 F.2d 1243 (11th Cir.1983). Misjoinder under Rule 8(b) is prejudicial *per se* and requires a new trial. *United States v. Kabbaby*, 672 F.2d 857 (11th Cir.1982). In order to determine whether joinder is sound, a reviewing court must examine the face of the indictment. If the indictment's allegations, taken as true, establish a single conspiracy, and there is no claim of prosecutorial bad faith or an erroneous interpretation of law, the court must conclude that the initial joinder was proper. *United States v. Russell, supra; United States v. Leach*, 613 F.2d 1295 (5th Cir.1980); *United States v. Levine*, 546 F.2d 658 (5th Cir. 1977). In some cases, however, it has been held appropriate to consider the evidence adduced at trial as well as the allegations of the indictment in deciding a Rule 8(b) claim. *United States v. Leach, supra; United States v. Nettles*, 570 F.2d 547 (5th Cir.1978). In considering the evidence or the indictment, the reviewing court must determine whether there was "a substantial identity" of facts and participants between the offenses charged. *United States v. Marionneaux*, 514 F.2d 1244 (5th Cir.1975). The character of the acts must have been similar, *id.*, and each of the actors must have known that he acted in furtherance of a common plan in which other participants were involved, *United States v. Levine, supra*. But each participant need not have been involved in every phase of the venture, *United States v. Russell*, nor need he have known the identity and role of each of the other participants, *id.* Repetition of the same mode of

operation may also provide a strong indication of a larger scheme behind numerous individual offenses. *United States v. Leach, supra.*

The propriety of the initial decision to join all appellants in a single indictment is not contested. Consideration of the face of the indictment reveals that it included a conspiracy charge; and no allegations of prosecutorial bad faith or misapprehension of the law were made at the time the indictment was handed down. *United States v. Russell, supra; United States v. Leach, supra.* Appellants claim, however, that the subsequent dismissal of the conspiracy charge removed the sole basis for joinder, and that their continued joinder and joint trial were therefore unduly prejudicial.

■ To resolve appellants' Rule 8(b) claim,[1] it is necessary to look beyond the face of the indictment, *United States v. Leach, supra,* as it is the lack of correspondence between the face of the indictment and the evidence on which the trial proceeded that is the source of the challenge. The evidence adduced at trial suggests that appellants were part of a "series of transactions" which makes it appropriate for them to be joined in the same indictment. There is a large amount of factual similarity between the offenses which made up the indictment: all of them involved the exchange of cash, weapons or services for food stamps provided by agent Johnson. *United States v. Marionneaux, supra.* There is also substantial, though not complete, overlap of participants: Andrews is charged in almost every count, and each appellant other than Tatum in multiple counts. *Id.* Although the extent to which Stokes, Royster and Tatum knew of each other's roles is not clear, each of them knew and participated in connection with Andrews. *United States v. Levine, supra.*[2] And while their mutual enterprise had less the character of a discrete objective than some cases in which joinder has been upheld, *see United States v. Russell, supra* (mutual object arranging the delivery of a single shipment of drugs), appellants shared the general object of trafficking illegally in food stamps. Finally, several of the individual offenses displayed a common mode of operation, with Tatum or Stokes supplying funds for purchase of the food stamps, and taking the stamps from (or holding the stamps for) Andrews after he had received them from Johnson.[3] *United States v. Leach, supra.* The district court did not err in rejecting appellants' claim under Rule 8(b).

---

**1.** There is a threshhold question as to whether this claim should be considered to be a Rule 8(b) claim or a Rule 14 claim, given the fact that the determinative event (the dismissal of the conspiracy claim) occurred after the drawing-up of the indictment (the event which is the subject of most Rule 8(b) claims) and before the trial (the events of which are the subject of most Rule 14 claims). It seems appropriate, however, that this be considered a Rule 8(b) claim, as appellants are arguing not merely that they were prejudiced by being indicted and tried together, but that given the dismissal of the conspiracy charge it is inappropriate for them to be charged in the same indictment because there is insufficient evidence that they were part of a single scheme. While at least one case has treated a similar claim arising from the dismissal of a conspiracy count as a Rule 14 claim, *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), this case is distinguishable, as the dismissal and the motion to sever occurred during the course of the trial.

**2.** The instant case thus is distinguishable from two cases in which joinder was held to be improper: *United States v. Levine, supra,* in which the parties involved in two distinct conspiracies were connected only by a jointly-placed phone call, out of 20 other overt acts, and *United States v. Nettles, supra,* in which three separate gambling conspiracies were connected only by the role of three law enforcement officers who thwarted enforcement efforts directed against each group of gamblers.

**3.** Royster's role was somewhat different, but this seems attributable largely to the fact that, because Royster was a law enforcement official, Johnson presented him with different types of opportunities to become involved in the scheme. Royster was clearly acquainted with Andrews, and knew of Andrews' connection with Johnson, as he made reference during his first phone conversation with Johnson to the fact that Andrews was being watched by law enforcement officials. His connection with Andrews and Andrews' side of the illicit scheme was also made clear by their cooperation in the production of a shotgun, which was paid for with food stamps.

## 2. Severance

▮▮▮ Rule 14 provides that "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Unlike a determination under Rule 8(b), the grant or denial of a Rule 14 motion lies within the sound discretion of the trial court and is reversible only for abuse of discretion. *United States v. Kabbaby, supra.* To demonstrate that a trial court abused its discretion in denying a motion for severance, a party must show that he "suffered compelling prejudice against which the trial court was unable to afford protection." *United States v. Russell, supra.*

Stokes argues that the joint trial was prejudicial to her because Andrews' defense of entrapment was antagonistic to her defense of lack of knowledge, and because the admission of statements made about her by co-defendants and agent Johnson were damaging to her case. Stokes is unable, however, to demonstrate "compelling prejudice" with respect to any of these claims.

▮▮▮ "Compelling prejudice" does not automatically arise from the assertion by one defendant of an entrapment defense at a joint trial. *United States v. Walker,* 720 F.2d 1527 (11th Cir.1983). It is necessary that the two defenses be mutually exclusive and irreconcilable. *Id.* at 1534. The claims made by Stokes and Andrews were neither; if she was, as she stated, in the habit of lending him money, she could have done so unaware that he was spending the money on illicit food stamps. The real conflict was not between the entrapment claim and her defense, but between her

defense and Johnson's testimony that he had seen her through the window of her house receiving food stamps from Andrews (see Section IIC., *infra*). As Johnson would most likely have offered this evidence even in a separate trial, there appears to have been no prejudice arising from the joint trial. The statements made by appellants concerning Stokes related almost exclusively to her presence at encounters between other participants (i.e., Andrews met Johnson at Stokes' house, or Stokes "might have been there" when Johnson met Andrews at the fish market). There were no statements indicating that Stokes participated knowingly in any transaction with Johnson. Moreover, the jury was initially instructed by the trial court that

> what somebody says out of the presence of a co-defendant ... what they saw about somebody else is not evidence of that other person's guilt. It is hearsay as to that other person so you don't pay any attention to the hearsay and the gossip.

The jury was subsequently instructed that it could consider statements by co-defendants against each other only if it found both parties to be participants in a "common plan." Stokes has failed to demonstrate, with respect to any of her claims for severance, "compelling prejudice" beyond the power of the court to control. The joint trial of the defendants was not improper.

## B. Entrapment

▮▮▮ Andrews argues that he was entrapped as a matter of law through the actions of agent Johnson, and that the court erred in submitting the case to the jury. He also argues that, even if the case was properly submitted to the jury, the government failed to produce evidence which proved that he was predisposed to commit the offense charged.[4]

---

**4.** Andrews also argues that the government was guilty of conduct so "outrageous" as to violate his Fourteenth Amendment right to due process. This claim is wholly without merit. To be so "outrageous" as to effect a denial of due process, government enforcement techniques must be "fundamentally unfair" or "shocking to the uni-

versal sense of conscience," *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *United States v. Mulherin,* 710 F.2d 731 (11th Cir.1983). The circumstances of this case surely fail to meet this stringent standard.

A defendant who seeks to raise a defense of entrapment must first come forward with evidence sufficient to raise a jury issue "that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *United States v. Dickens*, 524 F.2d 441, 444 (5th Cir.1975). A defendant will be considered to have met this burden if he produces "any evidence" that governmental conduct created such a risk, *Pierce v. United States*, 414 F.2d 163 (5th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969), but evidence that the government agent sought out or initiated contact with the defendant, or was the first to propose the illicit transaction, has been held to be insufficient to meet the defendant's burden. *United States v. Humphrey*, 670 F.2d 153 (11th Cir.1982); *United States v. Hill*, 626 F.2d 1301 (5th Cir.1980). The defendant must demonstrate not merely inducement or suggestion on the part of the government but "an element of persuasion or mild coercion." *United States v. Hill, supra.* The defendant may make such a showing by demonstrating that he had not favorably received the government plan, and the government had had to "push it" on him, *United States v. Hammond*, 598 F.2d 1008 (5th Cir.1979), or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate, *United States v. Timberlake*, 559 F.2d 1375 (5th Cir.1977). When the defendant makes such a showing, the burden shifts to the government to demonstrate beyond a reasonable doubt that the defendant was predisposed to commit the offense charged. *United States v. Dickens, supra.* In demonstrating predisposition, the government is not restricted to using past offenses or reputation evidence. *Id.* at 445. Evidence of predisposition may also include the readiness or eagerness of the defendant to deal in the proposed transaction, *id.; United States v. Jones*, 473 F.2d 293 (5th Cir.1973), or post-crime statements such as "if you need more, I'll be here," *United States v. Dickens, supra; United States v. Jenkins*, 480 F.2d 1198 (5th Cir.1973). Appellate review of a jury decision on entrapment is directed to whether the evidence was sufficient to enable a reasonably-minded jury to reach the conclusion that the defendant was predisposed to take part in the illicit transaction. *United States v. Dickens, supra.*

This court has held that the doctrine of entrapment as a matter of law did not survive the Supreme Court's opinion in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Struyf*, 701 F.2d 875, 877 n. 6 (11th Cir.1983), so appellant's first claim must be rejected. The court may have erred, nonetheless, in submitting the entrapment question to the jury (though such error would be harmless), because Andrews did not present sufficient evidence to create a jury question on the issue of entrapment. He argued that Johnson made the initial contact and the first reference to the transaction, and that he was induced to join the food stamps scheme by Johnson's statement that it would help the elderly. But such evidence, as noted above, is not sufficient to establish a jury question on entrapment. *United States v. Humphrey, supra; United States v. Hill, supra.* And Andrews' claim that he was induced to join by the promise that it would help the elderly does not demonstrate the kind of "persuasion or mild coercion" that has been required to meet the defendant's burden. *Id.* The evidence demonstrates no initial problems in setting up the transaction, nor any direct refusal by Andrews to take part, *United States v. Timberlake, supra.* Nor does it suggest that Andrews' willingness to participate was contingent on the plan's potential to help the elderly. Andrews' account suggests, instead, that he was disposed toward the scheme from the outset and found the idea of helping the elderly additionally enticing. He has thus demonstrated only governmental "inducement," which is insufficient to establish a jury question on the issue of entrapment. *United States v. Hill, supra.*

Moreover, even if Andrews established a jury question on the issue of entrapment, the evidence was sufficient to

support the jury's verdict. Though Andrews correctly notes that the government demonstrated no prior related offenses, this is not dispositive of the question of predisposition. *United States v. Dickens, supra.* Andrews agreed readily to the scheme, establishing at the first meeting the terms on which the food stamps would be transferred. *Id.* And instead of waiting until the appointed time to meet with Johnson on the day following this initial encounter, Andrews came to Johnson's motel early in the morning to continue discussions about the food stamps. There was ample evidence from which a reasonably-minded jury might conclude that Andrews was predisposed to commit the offense.

### C. Sufficiency of the Evidence

■ Stokes and Tatum argue that there was insufficient evidence to support their convictions. With respect to such a claim, a reviewing court must determine "whether, viewing the evidence in the light most favorable to the government ... a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). It is not necessary that the evidence "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.*

■ Under this standard, the evidence is sufficient in both cases to support the jury's verdict. Stokes was formally introduced to Johnson by Andrews in September 1982 at the fish market, and told to "take care of" him. Stokes provided Andrews with the cash that was used to buy the food stamps on September 9, 1982, and February 1, 1983; on the latter date Johnson also saw Stokes take the food stamps that he had transferred to Andrews. This was ample evidence from which to conclude that she had participated in the illicit traffic in food stamps. Similarly, Tatum held a brief discussion with Andrews on January 25, 1983, following which both Andrews and Johnson took a detour to Tatum's office at Stout Realty Company. On Febru-

ary 1, 1983, Johnson observed Tatum playing the same role that had been filled by Stokes: giving cash to Andrews and receiving the food stamps that had been transferred from Johnson. Tatum, moreover, did not protest his innocence but simply argued that it would not have been possible for Johnson to see his activities in his doorway from Johnson's position in his parked car in the driveway. There was sufficient evidence upon which to convict him as well.

### D. Cross-Examination of Andrews

After the government had rested, counsel for Andrews advised the court that he wanted to call Andrews to the stand, but was concerned that the government might use cross-examination as an opportunity to inquire about co-defendants. The court replied that cross-examination would be limited to areas covered on direct examination. Andrews' attorney agreed, but the prosecutor stated that this ruling would make the government look foolish for failing to question Andrews about the full scope of the indictment and would permit favorable inferences to be drawn as to co-defendants when the government failed to ask whether Andrews had sold food stamps to a particular co-defendant. The court responded that it would instruct the jury that each defendant was being tried separately and that any defendant who took the stand would be cross-examined only as to his own involvement. The court confirmed the following day that it would limit cross-examination of Andrews to any matter testified to on direct examination or any matter affecting credibility. The court also stated that the question of whether counsel for co-defendants could cross-examine Andrews would be resolved following his direct testimony, according to the circumstances that developed.

During direct testimony Andrews made no reference to Royster or any events involving Royster. During cross-examination by the government, counsel for Royster interrupted to move for severance, stating that he had not counted on cross-examination by the government and that the

current line of questioning would place his client in a difficult position if he undertook to cross-examine Andrews. The court responded that it saw no grounds for cross-examination by Royster and denied his motion for severance. Royster claims that the denial of any opportunity for cross-examination of Andrews violated his Sixth Amendment right to confrontation.

 Appellant correctly asserts that the right to cross-examination is comprehended in the Sixth Amendment right to confrontation. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). This right is not, however, absolute or incapable of restriction. Its curtailment is within the discretion of the trial court, *Greene v. Wainwright,* 634 F.2d 272 (5th Cir.1981), and it is subject to the requirements of relevance and probative value. *Id.; Cloud v. Thomas,* 627 F.2d 742 (5th Cir.1980). Moreover, the Sixth Amendment guarantees only the opportunity to confront *adverse* witnesses, *United States v. Bujese,* 434 F.2d 46 (2d Cir.1970); it does not guarantee the right to confront witnesses who testify not against but rather in favor of the party asserting the right. *Cf. United States v. Bujese, supra,* 434 F.2d at 48 (no right to cross-examine co-defendant who confessed on stand and testified for appellant). In that portion of the trial addressed by this claim, Andrews does not appear to have been a witness adverse to either Royster or the other co-defendants. Counsel for Andrews first proposed the limitation on cross-examination in order to prevent the government from putting questions to Andrews concerning the actions of his co-defendants. Andrews' testimony did not even mention Royster, let alone implicate him in any wrongdoing. The trial court was within its discretion in denying counsel for Royster the opportunity to cross-examine Andrews.

### E. Admissibility of Agent Johnson's Tape

On direct examination Agent Johnson testified that on February 1, 1983, he looked through the window of Stokes' home and saw her take food stamps from Andrews and give him money in return.

As part of her defense, Stokes adduced testimony and photographs suggesting that it would not have been possible for Johnson to see through her window. Subsequently, the government sought to introduce a tape made by Johnson as he was looking through the window, recording his impressions of what he saw. Stokes challenged the admissibility of the tape, stating that it was self-serving hearsay recorded outside the presence of the defendant, and that it was not offered in rebuttal but merely as repetitive testimony. After an extended exchange, the court admitted the tape under the present sense impression exception to the hearsay rule. On appeal, Stokes repeats her earlier objections. She also claims that the tape was a prior consistent statement that fails to conform to the standards applicable to such statements: that they must be useful to rebut a charge of recent fabrication or improper motive and that they must have been made before the motive to fabricate arose. *United States v. Rubin,* 609 F.2d 51, 61 (2d Cir.1979); *United States v. Delk,* 586 F.2d 513, 519 (5th Cir.1978). Stokes claims that because Johnson wanted evidence implicating her in the food stamp scheme, he had a motive to falsify even at the time he made the tape.

 Appellant's claims have little merit. Although the statements may have been hearsay recorded out of the presence of the defendants, they fall clearly within the exception for present sense impressions, which are admissible on the ground that "the substantial contemporaneity of the event and statement negates the likelihood of deliberate or conscious misrepresentation." *United States v. Peacock,* 654 F.2d 339, 350 (5th Cir.1981). Moreover, the recorded statements also meet the requirements for admissibility as prior consistent statements. Stokes clearly presented a *claim of fabrication and improper motive* when she alleged that it would have been impossible for Johnson to see inside the window of her house, which the recording served to rebut. And contrary to her speculative claim, Johnson had no motive to fabricate evidence at the time he peered in the window. The motive to fabricate evi-

dence concerning the transaction inside Stokes' house would have arisen, if at all, when Stokes challenged Johnson's ability to see into her window. By that time it was too late to make a tape recording. The district court did not abuse its discretion in admitting the tape into evidence.

### F. Jury Instruction on Entrapment

Finally, Andrews argues that the district judge's delivery of a jury instruction on entrapment which was different from the one that he had said at conference he would use deprived him of a fair trial. There is little merit to this claim. The judge stated at conference that he would deliver the instruction from *United States v. Dickens, supra,* that predisposition could be inferred not only from prior acts but from eagerness to take part in the proposed scheme. The court subsequently added the instruction, also from *United States v. Dickens, supra,* that predisposition could be inferred from post-crime statements such as "If you need anything else or more I will be here," because the court believed that Andrews' closing argument on entrapment had misstated the law. The trial court is vested with broad discretion in formulating its charge, so long as it accurately reflects the law. *United States v. Walker, supra.* The instruction given was an accurate statement of the law. *See United States v. Dickens, supra;* and Section IIB., *supra.* The court did not abuse its discretion in giving this instruction, or in altering the proposed instruction to compensate for a misstatement of the law perpetrated by appellant.

The judgments of guilt of appellants entered by the district court are AFFIRMED.