**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Howard W. KINDIG, Jr., and A. Larry
Tullos, Defendants–Appellants.**

No. 87–3781.

United States Court of Appeals,
Fifth Circuit.

Aug. 26, 1988.

Herbert V. Larson, Ronald J. Rakosky, New Orleans, La., Nathan S. Fisher, Baton Rouge, La., for Kindig.

Sam J. D'Amico, Baton Rouge, La., for Tullos.

Ian F. Hipwell, Randall B. Miller, Asst. U.S. Attys., P. Raymond Lamonica, U.S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before POLITZ and JOHNSON, Circuit Judges, and BOYLE,* District Judge

EDWARD J. BOYLE, Senior District Judge:

Appellants, A. Larry Tullos and Howard W. Kindig, Jr., bring direct appeals from their convictions for violations of federal banking laws. Finding no substance in their various allegations of error, we affirm their respective convictions.

## FACTUAL BACKGROUND

John M. "Jack" Kent is the original owner and founder of Blast Abrasives, a company which provided services to the offshore oil and gas industry. When the fortunes of that industry took a turn for the worse in 1982 and 1983, Blast Abrasives experienced considerable financial difficulty. To shore up his troubled company, Jack Kent sought a loan package of approximately $13.5 million dollars in the spring of 1983 from Sun Belt Federal Savings and Loan Association ("Sun Belt").

Sun Belt would eventually provide a loan package in the summer of 1983 totalling approximately $7.5 million dollars. First, a loan of $3 million dollars would be made to Blast Abrasives. Second, a loan of $1.5 million dollars would be made to Jack Kent. Third, a $3 million dollar loan would be made to Kindig, who would in turn lend those monies to Kent. The indictment alleges, and Tullos testified, that Sun Belt, whose net worth at the time was between $2 million dollars and $3 million dollars, could not lend more money directly to Kent without violating the "loans to one borrower" lending limitations imposed by federal regulations then in effect, 12 C.F.R. § 563.9–3(b) (1983). This rule prohibited a federally insured institution from lending to one borrower more than the net worth of the institution or more than ten percent of the institution's withdrawable accounts, whichever was less.

---

* Senior District Judge of the Eastern District of     Louisiana, sitting by designation.

Tullos, who had joined Sun Belt in March, 1983 as a senior lending officer, approached Kindig in July, 1983 and proposed that Kindig, who had a net worth of $2.3 million dollars, borrow $3 million dollars from Sun Belt and then lend the funds himself to Kent. Kindig, upon careful deliberation and consultation with his attorney, agreed to proceed with the proposed transactions, provided they were structured to minimize his risk and maximize his protection. Kindig wanted, among other safeguards, (1) an escrow account created out of monies loaned by him to Kent amounting to six months' payments on Kindig's notes to Sun Belt and (2) a first mortgage upon an 84 acre tract of land and its improvements owned by Kent. Additionally, Kindig's loan from Sun Belt would automatically convert from monthly to semi-annual notes in the event the escrow fund should be depleted to allow Kindig enough time to foreclose on Kent's property. In fact, Kindig got a second mortgage on the property, pursuant to his loan agreement with Kent. Government Exhibit 21.

There is disagreement as to when Kindig's loan from Sun Belt was approved and what it was approved for. Although appellants note that the minutes of the July 19, 1983 meeting of Sun Belt's executive committee reflect that Tullos (who became Sun Belt's president and chief executive officer on that day) orally presented Kindig's loan application to the committee, which approved it, *see* Government Exhibit 8, yet the Government notes that Kindig's loan summary is attached to the minutes of the committee's meeting of August 2, 1983. *See* Government Exhibit 9. Similarly, the minutes of the July 19 meeting merely state that the proposed loan to Kindig will be secured by a mortgage on Kent's property, *see* Government Exhibit 8, yet the loan summary expressly indicates that the purpose of the loan was Kindig's *purchase* of Kent's land. *See* Government Exhibit 9. Two other documents, which formed the basis of the indictment herein and stood at the center of the trial, identified this purchase as the purpose of Kindig's Sun Belt loan: Kindig's loan application, dated July 25, 1983, Government Exhibit 1; and Sun Belt's loan commitment letter dated July 26, 1983, signed by Tullos and countersigned by Kindig. Government Exhibit 2.

On July 28, 1983, three loans were closed at Sun Belt's office in Baton Rouge. First, a $1.5 million dollar loan was made from Sun Belt to Kent personally. Second, Sun Belt loaned Kindig $3 million dollars. Third, Kindig loaned $2,783,156.34 to Kent. For this last transaction, Kindig charged Kent a $280,000 loan fee. Moreover, Kindig's loan from Sun Belt was made at an annual rate of 14.25 percent, amortized over a thirty year period, but payable over a five year term of monthly installments of $36,140.61, followed by a balloon payment for the balance at the end of the five year period. Kindig made the loan to Kent at an annual rate of 16.00 percent, amortized over a thirty year period, but payable for five years at monthly installments of $37,443.32, with a balloon payment for the balance, due at the same time as Kindig's balloon note would fall due to Sun Belt.

Approximately six months later, Kent stopped making payments on his loan from Kindig. Kindig then exhausted the six month escrow fund and unsuccessfully attempted to foreclose on Kent's property. Kindig's loan from Sun Belt went into default in the fall of 1985, not long after Sun Belt was taken over by the Federal Savings and Loan Insurance Corporation.

On March 5, 1987, the grand jury returned a four-count indictment against Tullos and Kindig. Count I charged that Kindig, aided and abetted by Tullos, for the purpose of influencing Sun Belt, falsely represented in the loan application that the purpose of the loan was the purchase of Kent's property, in violation of 18 U.S.C. §§ 1014 and 2. Count II charged that Kindig, aided and abetted by Tullos, made similar statements in the loan commitment letter, in violation of 18 U.S.C. §§ 1014 and 2. Count III charged that Tullos, aided and abetted by Kindig, made false statements in the same commitment letter for the purpose of deceiving Sun Belt and federal bank examiners, in violation of 18 U.S.C. §§ 1006 and 2. Count IV charged that Tullos, aided and abetted by Kindig, misap-

plied Sun Belt's funds, in violation of 18 U.S.C. §§ 657 and 2. On Kindig's motion, Record Document ("R.D.") 37, the Court on August 21, 1987, ordered any references to the "loans to one borrower rule" stricken from the indictment. R.D. 61.

Trial by jury began on August 24, 1987, and verdicts were returned on August 31, 1987. Tullos was convicted on Counts I, II and III. Kindig was convicted on Count III. No verdict was returned as to Kindig on Counts I and II; no verdict was returned as to either defendant on Count IV. The Court declared a mistrial on Counts I, II and IV as to Kindig, and on Count IV as to Tullos. The Government moved to dismiss those counts that resulted in mistrial, and the Court ordered the dismissal on October 21, 1987. R.D. 82. Timely appeals were lodged by Kindig and Tullos.

TULLOS' APPEAL

Tullos challenges the sufficiency of the evidence as to his conviction on each count. As to Counts I and II, Tullos maintains, first, that whereas the loan application, Government Exhibit 1, is dated July 25, 1983, and the loan committment letter, Government Exhibit 2, is dated July 26, 1983, yet the loan was approved on July 19, 1983, Government Exhibit 8. Hence, the application and the commitment letter could not have been confected for the purpose of influencing the action of Sun Belt to approve the $3 million dollar loan to Kindig, as charged in Counts I and II.

Second, argues Tullos, the Sun Belt executive committee could not possibly have been deceived concerning the true purpose of the loan to Kindig, which is reflected by other documents in the file. In any case, Tullos contends, there was no evidence that the loan commitment letter or the application were ever presented to the committee.

As to Count III, Tullos complains that there was insufficient evidence to warrant Tullos' conviction because Norman K. Lloyd, an examiner with the FSLIC who testified that a review of the Kindig loan file led him to conclude that the loan's purpose was a purchase, admitted that he had not seen the minutes of the July 19, 1983 meeting of the Sun Belt executive committee, which, as noted above, stated only that the loan would be secured by a mortgage on Kent's property, and not that the loan would be used for its purchase. *See* Government Exhibit 8. Tullos also argues that Lloyd's conclusion cannot be squared with examination work papers which appear to acknowledge title to the mortgaged property remaining in Kent. *See* Government Exhibit 55.

Finally, Tullos also maintains that the testimony of John C. Anderson, a supervisory agent for the Federal Home Loan Bank of Dallas, focused on the "loans to one borrower" rule so much as to bootstrap a civil regulation into a crime.

■ We reject all of these allegations of error. First, completely aside from the fact that the jury was free to conclude that the loan approval occurred not on July 19, 1983 but on August 2, 1983, the elements of 18 U.S.C. § 1014, as a matter of law, can still be made out even when an allegedly false document has not been furnished to a bank until after a loan has actually been made. *See United States v. Baity*, 489 F.2d 256, 257 (5th Cir.1973). Section 1014 "is not merely directed to false statements which are actually used in the decision to make a loan. *It requires that all statements supplied to lending institutions ..., which have the capacity to influence them, be accurate or at least not knowingly false...." United States v. Goberman*, 458 F.2d 226, 229 (3d Cir.1972) (emphasis added) (citations omitted). Second, it is similarly of no moment whether the application and loan commitment letter were actually relied on by the committee, *see United States v. Bowman*, 783 F.2d 1192, 1199 (5th Cir.1986), nor even whether they were directly presented to the committee. *U.S. v. Lentz*, 524 F.2d 69, 71 (5th Cir.1975).

■ Moreover, the standard for appellate review of sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (original emphasis). "The verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Thompson,* 811 F.2d 841, 844 (5th Cir.1987), *quoting Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). As the application at issue was required by bank policy to be in the loan file prior to approval, Government Exhibit 5 at 1112; and as the commitment letter was required at or before closing, Transcript Vol. VII at 118 (testimony of Tullos); and as other members of the executive committee testified that when Tullos presented the Kindig loan to them, they actually believed its purpose was the purchase of the Kent property, Transcript Vol. V at 172 (testimony of Robert Amacker), at 202 (testimony of Robert Holt), there was ample evidence from which the jury might reasonably have inferred that Tullos knew the statements at issue were false and that the two documents had "the capacity to influence" the actions of Sun Belt on the loan. *United States v. Goberman,* 458 F.2d at 229.

█ Tullos has likewise advanced no valid reason to disturb his conviction on Count III. The jury was entirely free to credit the testimony of bank examiner Norman Lloyd that he was actually deceived by the commitment letter as to the purpose of Kindig's loan, Transcript Vol. VI at 121–22. We cannot say that this highly probative testimony "is so incredible on its face that it defies physical laws," *United States v. Chagra,* 669 F.2d 241, 257 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982), and so are constrained to

conclude that a reasonable jury might have inferred that the commitment letter was confected with such deceit in mind.

█ Finally, we find Tullos' "loans to one borrower" argument to be unpersuasive. Not only was the indictment actually redacted to accommodate the requirements of *United States v. Christo,* 614 F.2d 486 (5th Cir.1980), R.D. 37, 61, but it appears that the jury was twice charged that they were not to consider potential violations of this civil regulation as a crime.[1] We agree with the Government that the charge given by Judge Polozola substantially comports with that approved by the Eleventh Circuit in *United States v. Stefan,* 784 F.2d 1093, 1099 (11th Cir.1986), and we likewise approve this charge.

## KINDIG'S APPEAL

Kindig challenged his conviction on Count III for two reasons. First, Kindig maintains there was insufficient evidence to support his conviction. Kindig contends that to be found guilty of aiding and abetting Tullos in the violation of 18 U.S.C. § 1006, the Government must prove that Kindig in some manner assisted Tullos in the commission of the offense, and that Kindig shared Tullos' criminal intent. Kindig argues that the evidence cannot constitute such proof and that the only evidence directed to Count III is Kindig's actual signature on the loan commitment letter. There was, maintains Kindig, little testimony concerning the commitment letter, and there was no evidence of any kind to impeach Kindig's own testimony that he signed the letter without reading it. In Kindig's view, reasonable doubt should nec-

---

1. The jury was originally charged on Friday, August 28, 1987. In response to a jury request, it was recharged on Saturday, August 29, 1987. On both occasions, the Court instructed the jury as follows

   The loan to one borrower rule is a civil statute or regulation which limits the amount that a federally regulated bank may lend to a borrower or a related group of borrowers. Therefore, violation of the one borrower rule should not be considered by you as a violation of the criminal law. You may consider, however, evidence of or violations of the one borrower rule as you would any other evidence in determining whether or not the defendants had the required intent to violate the criminal laws charged in this indictment. In other words, violations of the one borrower rule should not be considered as violations of the criminal law. You may consider this evidence, however, as you would any other evidence in determining whether the defendants had the required intent to commit any of the crimes charged in the indictment. Transcript Vol. 11 at 25; Supplemental Record on Appeal at 23.

essarily have been excited by the minutes of the July 19, 1983 committee meeting (which say nothing about the purchase of Kent's property nor by whom the mortgage referred to therein would be granted) and by the fact that federal examiner Norman Lloyd testified that lending $3 million dollars to Kindig for any purpose would have violated that rule. Transcript Vol. VI at 176–77. Thus, Kindig argues, it was equally improper for Sun Belt to lend the money to Kent indirectly, through Kindig, as it was to lend it directly, and hence the Government's suggested motive for commission of the crime did not really exist.

■ We find no merit in this allegation of error. Even a casual review of Kindig's own testimony discloses ample evidence from which a reasonable jury could infer that he knew the contents of the commitment letter and hence intended the natural consequences of signing it, namely the deceit which the Government proved was actually achieved. Kindig testified that he had extensive experience with loans and loan paperwork, Transcript Vol. IX at 57; *id.* at 43 ("I have borrowed millions, I am talking about millions. I ain't talking about no ten or twelve. I am talking about millions of dollars,"); that he exercised substantial control over the instant transactions, which were structured to minimize risk and maximize protection, *id.* at 71–78; and that he stood to realize sizeable profits from the deal. *Id.* at 25–29. In light of his testimony, not to mention the odd coincidence that his loan application *also* said the purpose of the loan was a purchase, Government Exhibit 1, (this document, signed two days before Kindig signed the commitment letter, contains an express acknowledgment that its contents are true and correct), a reasonable jury might well reject Kindig's protests that he signed the commitment letter without reading it or knowing its contents.

Kindig's second allegation of error is that Judge Polozola infringed Kindig's sixth amendment right of confrontation by prohibiting his cross-examination of his co-defendant Tullos. It appears that Judge Polozola, at the time the two defendants were required to inform the Court whether they intended to put on a joint defense or separate defenses, ruled, before hearing any defense testimony, that neither defendant could "participate in the questioning of each other's witnesses" if they presented separate defenses, Transcript Vol. VI at 247–48; but each defendant would still be free to call his co-defendant on direct, if the co-defendant had taken the stand in his own defense. *Id.* Kindig did not call Tullos.

Kindig notes that restricting the cross-examination of a co-defendant who gives inculpatory testimony violates a defendant's right to confront adverse witnesses. *See United States v. Crockett,* 813 F.2d 1310, 1313 (4th Cir.1987). Kindig complains that although Tullos' direct testimony was generally exculpatory for both defendants, yet Tullos gave some testimony that Kindig assisted him with respect to some elements of 18 U.S.C. § 1006. Kindig does not specify which elements, and his references to Tullos' transcript do not support this assertion, as discussed more fully below. Kindig finds especial fault with allegedly incriminating facts or unfavorable inferences that *could* be drawn from neutral facts elicited by the prosecution upon cross-examination of Tullos, including (1) how Kindig became involved in the deal and the interest rate charged to him; (2) the profit to be made by Kindig; (3) the reasons for the structure of Kindig's loan from Sun Belt and his loan to Kent; and (4) Kindig's knowledge *vel non* that he had got a second mortgage, rather than a first, on Kent's property. According to Kindig, the prosecution incriminated him by use of its cross-examination of Tullos.

We reject this allegation of error. The sixth amendment "guarantees only the opportunity to confront *adverse* witnesses ...; it does not guarantee the right to confront witnesses who testify not against but rather in favor of the party asserting the right." *United States v. Andrews,* 765 F.2d 1491, 1501 (11th Cir.1985) (citations omitted) (original emphasis).

Trial courts need not assess the adverse nature of testimony according to formal-

istic categories—by whether a co-conspirator was called by the Government, or is testifying on his own behalf or on behalf of a co-defendant. The critical matter is not the formal status of a witness but the actual content of his testimony. *United States v. Crockett*, 813 F.2d at 1314.

Indeed, in *Andrews*, the trial court ruled "that the question of whether counsel for co-defendants could cross-examine [defendant] Andrews would be resolved following his direct testimony, according to the circumstances that developed." *United States v. Andrews*, 765 F.2d at 1500. We view this practice as far preferable to the "formalistic categories" which Judge Polozola seems to have applied herein.

■ Nevertheless, as none of Tullos' testimony was actually adverse to Kindig, we conclude that no right of confrontation ever arose. First, Tullos expressly and emphatically denied that the commitment letter reflected an intent to deceive, and, in a direct challenge to examiner Norman Lloyd's testimony, Tullos insisted that the Kindig loan file was replete with evidence of the true nature of the transaction, Transcript Vol. VII at 46; Tullos also testified that Kindig actually got the proceeds of the loan applied for, so that there was no misapplication of bank funds (an exculpatory assertion which must have had some impact on the jury, which failed to reach a verdict on Count IV). *Id.* at 46–47. Second, the testimony of Tullos regarding all of the circumstances surrounding the confection of the commitment letter substantially comports with Kindig's own testimony. Both testified that the considerable profit Kindig stood to make from the transactions was a fair return for the financial risk he took in the first place. *Compare* Transcript Vol. VII at 14; at 54–56; at 60 (testimony of Tullos) *with* Transcript Vol. IX at 21–23; at 62–65 (testimony of Kindig). Both testified that Kindig was not a "strawman," i.e., a convenient way to circumvent the "loans to one borrower rule," but rather a borrower in his own right who had a "healthy financial picture;" in both appellants' testimony, Kindig was one borrower from Sun Belt and Kent was another. *Compare* Transcript Vol. VII at 41; at 129–31; at 137 (testimony of Tullos) *with* Transcript Vol. IX at 20; at 59; at 97 (testimony of Kindig). And, curiously enough, both testified that they did not read the commitment letter and were unaware that it identified the purchase of Kent's property as the purpose of Kindig's loan from Sun Belt. *Compare* Transcript Vol. VII at 23–25 (testimony of Tullos) *with* Transcript Vol. IX at 33–38 (testimony of Kindig).

■ Finally, Kindig asserts, but does not demonstrate that the jury failed to follow the six step process set out in the instructions for weighing the evidence adduced by each defendant as to that defendant alone; Kindig maintains that this alleged failure of the jury to follow its instructions resulted in his being convicted at least in part because of evidence used in Tullos' case and not solely on the evidence offered against Kindig, in violation of the fifth amendment.

A crucial assumption underlying [the] system [of trial by jury contemplated by the Constitution] is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed....

To say that the jury might have been confused [by the jury charge] amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the Court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions. There is nothing in this record to call for reversal because of any confusion or injustice arising from the joint trial. The record contains substantial competent evidence upon which the jury could find petitioner guilty. *Parker v. Randolph*, 442 U.S. 62, 73–74 & n. 6, 99 S.Ct. 2132, 2139–40 & n. 6, 60 L.Ed.2d 713 (1979), *quoting Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954).

**710**

As Kindig has not proffered a shred of evidence to support this assertion, we reject it as devoid of merit. There was sufficient evidence offered against Kindig on which a reasonable jury following the Court's instruction on the law could find Kindig's guilt beyond a reasonable doubt on Count III.

Accordingly, the foregoing considered, the convictions of Tullos and Kindig are both likewise AFFIRMED.