[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 15-14243; 15-14315
_____

D.C. Docket Nos. 1:14-cr-20773-KMW-1; 1:14-cr-20773-KMW-2


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ANTONIO RICHARD,
IFEMMUTA C. ADIRIKA,

Defendants - Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(February 3, 2017)

Before HULL, and MARTIN, Circuit Judges, and RESTANI,[*] Judge.

HULL, Circuit Judge:

Defendants Antonio Richard and Ifemmuta Adirika appeal their convictions and sentences. A jury found both defendants guilty of possession and conspiracy to distribute Oxycodone, a controlled substance. The district court sentenced Richard and Adirika to 36 and 40 months' imprisonment, respectively.

On appeal, the defendants jointly raise three main issues. First, the defendants argue entrapment. They claim that the government failed to present sufficient evidence that they were predisposed to commit their offenses prior to the involvement of a confidential government informant. Second, the defendants argue that the district court violated their Sixth Amendment right of confrontation by admitting the transcripts of Richard's recorded conversations—translated from Creole into English—without allowing for cross examination of the person who first translated those conversations. Third, the defendants argue that the district court abused its discretion and committed constitutional error in refusing to give jury instructions concerning a missing witness and the confidential informant's invocation of his Fifth Amendment rights.

---

[*]Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

Separately, Richard raises an individual claim that the government failed to present sufficient evidence of his Oxycodone possession and participation in the conspiracy.

After reviewing the briefs and the trial record on appeal, and with the benefit of oral argument, we affirm the defendants' convictions and sentences.[1]

## I. PROCEDURAL HISTORY

### A.    Indictment

On October 10, 2014, a federal grand jury in the Southern District of Florida returned a six-count indictment against the defendants. Count 1 of the indictment charged both defendants with conspiracy to possess oxycodone with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 2 charged Richard with possession of oxycodone with intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Counts 3 through 6 charged Adirika with possession of oxycodone with intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Both defendants pled not guilty on all charges and proceeded to a joint jury trial.

---

[1]Richard's advisory guidelines imprisonment range was 51 to 63 months. Adirika's advisory guidelines imprisonment range was 63 to 78 months. The defendants have challenged neither the advisory guidelines calculations nor the reasonableness of their below-guidelines sentences.

**B.     Trial, Jury Verdicts, Defendants' Requests for Relief**

On April 29, 2015, the jury was sworn, and the government opened its case-in-chief. Following the close of the government's case, the defendants rested and moved for judgments of acquittal, pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motions. The district court then instructed the jury as to each element required to prove Richard's and Adirika's respective possession and conspiracy charges. On May 5, 2015, the jury returned verdicts finding the defendants guilty on all counts.

After the verdicts, the defendants filed motions for new trial, pursuant to Federal Rule of Criminal Procedure 33. On July 8, 2015, the district court denied the defendants' new-trial motions.

**C.     Sentences**

On September 14, 2015, the district court sentenced the defendant Richard to concurrent terms of 36 months' imprisonment and three years' supervised release. The district court sentenced the defendant Adirika to concurrent terms of 40 months' imprisonment and three years' supervised release. The defendants timely appealed their convictions and sentences. This Court consolidated the appeals.

Because the defendants' consolidated appeal includes challenges to the sufficiency of the evidence presented against them, we recount in detail the trial evidence.

4

## II. BACKGROUND

### A.    Offense Conduct

On April 3, 2012, Drug Enforcement Administration (DEA) agents arrested Louis Valmyr, alias "Lucky," for the illegal distribution of 1,900 Oxycodone pills. Valmyr hoped to obtain leniency for his arrest. On April 4, 2012, the DEA offered Valmyr leniency if Valmyr would agree to work as a confidential informant for the DEA. Valmyr agreed. From that point forward, Valmyr provided confidential tips to the DEA in exchange for an expected sentencing benefit. During the relevant periods of this case, the DEA compensated Valmyr for his work, paying him between $1,400 and $1,900.

Later in April 2012, Valmyr told the DEA that he knew someone named Antonio that was involved with a woman who was a pharmacist. Valmyr told the agents that he was going to "see if he could get [the woman] to sell him some Oxycodone." After Valmyr told this to the DEA, DEA Special Agents Michael Burt and Joseph Bryson began an investigation into the suspected distribution of Oxycodone pills by Richard and the as-yet unidentified woman.

On May 23, 2012, Valmyr contacted the DEA. Valmyr told the DEA that, the day before, Valmyr had obtained an 80-milligram Oxycodone pill from Richard. The DEA was not aware of this apparent May 22, 2012 visit with Richard. Valmyr had made the visit "unannounced," and Valmyr had not made any

5

audio or video recording of the encounter. The DEA was also unaware that Adirika's residence was the location of Valmyr's apparent visit.

On May 23, 2012, when the DEA learned of Valmyr's May 22, 2012 visit with Richard, the DEA instructed Valmyr to return to Richard and to attempt to pay him $55 for the Oxycodone pill. The DEA equipped Valmyr with an audio-video recording device and gave him $200 in official funds to pay Richard for the pill. The audio-video recording device contained a "wire," which would allow DEA agents to listen to Valmyr's conversations in real time.

Later in the day on May 23, 2012, Valmyr went (with the money, recording device, and wire) to a residence where Richard was located and attempted to pay him for the pill. Valmyr and Richard had a conversation outside the residence, which Valmyr secretly recorded through the recording device provided to him by the DEA.

In this conversation, Valmyr told Richard that he had "like[d] the sample" that Richard had given him. Valmyr told Richard that he had sold the pill for $55 and advised Richard that he had a contact who was interested in meeting with him to buy Oxycodone. Valmyr then left the meeting.

Immediately after meeting with Richard, Valmyr met with Burt and Bryson. Valmyr told Burt and Bryson that he had just paid Richard $55 for the pill. The audio recording of Valmyr's conversation with Richard did not firmly establish an

6

exchange of money, but when the agents searched Valmyr, they found that Valmyr only had $145 of the $200 that the DEA agents had given him, a difference of $55. Valmyr turned over the $145, the recording device, and the wire to Burt and Bryson.

On June 6, 2012, the DEA arranged to have an undercover agent, DEA Special Agent Adrian Betancourt, meet with Richard at the Miller Ale House in North Miami Beach, Florida. Agent Betancourt's goals at the meeting were to ascertain Richard's capacity for furnishing large pill quantities and to identify Richard's supplier of Oxycodone pills. Betancourt attended the meeting with Valmyr and posed as "[a]n individual interested in buying large amounts of prescription pills," specifically, 30-milligram and 80-milligram Oxycodone pills for distribution. Betancourt wore a recording device to the meeting.

During the meeting, Richard told Betancourt that his source of supply for the pills was "a female who he had a romantic relationship with[,] from African descent[,] who lived in New Jersey at one point[,] and who now lives in South Florida." Richard mentioned that she was the "boss" of the supply operation and worked as "a pharmacist."

Betancourt attempted to negotiate with Richard for Oxycodone pills by offering Richard prescription pads and "ID's" or "identifications."  Betancourt later testified that he did this because the law required a patient to present both a

7

prescription and identification in order to have a prescription for Oxycodone filled. Richard rejected Betancourt's offer. Richard stated that "she," the supplier, did not need the items.

Betancourt then offered to purchase large quantities of 30-milligram Oxycodone pills from Richard on a regular basis if Richard could secure a price below $15 per pill. Richard replied that his source was not interested in attracting new customers. Richard commented that, "if it was up to him," he would lower the price to $12 or $13 a pill. However, Richard said that he did not control the pricing decision. Richard disclosed the financial arrangement between him and his source of supply: For each 30-milligram Oxycodone pill sold for $15, Richard received $1, and his source of supply received $14. Richard explained that his source of supply "kn[ew] the streets" and had a steady stream of customers willing to pay $15 for an Oxycodone pill.

Richard then alternatively proposed that Betancourt purchase 80-milligram Oxycodone pills from him. The proposition surprised Betancourt because, as Betancourt later testified at trial, offering such higher strength pills was "something—especially when you meet someone for the first time . . . something you don't do."

Betancourt did not move forward with the 80-milligram offer, but he asked Richard to introduce him to his source. Richard refused and told Betancourt that

8

"she don't want me to bring nobody." The meeting ended without any express agreement to meet with Betancourt or Valmyr in the future. Neither Richard, Betancourt, or Valmyr exchanged pills or money at the meeting.

On June 15, 2012, the DEA attempted to use Valmyr in a controlled buy of Oxycodone from Richard. Valmyr was to try and purchase ten 80-milligram Oxycodone pills for $600. The DEA provided Valmyr with the money for the sale, as well with an audio-video recording device (including a wire), which Valmyr wore. Valmyr tried calling Richard beforehand to set up a meeting, but Valmyr was unable to reach Richard. Therefore, Bryson drove Valmyr to a residence where Valmyr "had been . . . before" to "look[] for Richard."

Once at the residence, Bryson observed Valmyr approach the front door. A woman answered the door and greeted Valmyr. Recorded video of the scene showed that the woman was Adirika. Bryson later testified that this was, in fact, Adirika's residence. Valmyr entered the residence.

Once inside the residence, Valmyr found Richard. Valmyr and Richard then discussed an Oxycodone purchase. Valmyr paid Richard for ten 80-milligram Oxycodone pills and received them from Richard. During the transaction, Richard told Valmyr that "we have 2,000 in the 30s, 200 in the 80s," a reference to quantities of 30-milligram and 80-milligram Oxycodone pills. Richard also suggested that other buyers were involved, saying that "[p]eople came here for

9

300, 200. She can't give them the stuff that she already ordered for - - for the guys."

After the meeting, Valmyr met with Bryson and gave him the ten 80-milligram Oxycodone pills he had just purchased from Richard, along with the recording device (and wire). The pills were wrapped in aluminum foil.

On July 30, 2012, Valmyr, equipped with a DEA recording device (and wire) and acting under DEA direction, met with Adirika. Valmyr made a controlled purchase of twenty 80-milligram Oxycodone pills for $60 apiece or a total of $1,200. The DEA provided the money for the purchase. Following the meeting, Valmyr turned over the twenty 80-milligram pills and the recording device to Bryson. The pills were packaged in foil.

On September 7, 2012, Valmyr, equipped with a DEA recording device (and wire) and acting under DEA direction, met with Richard and Adirika. Valmyr made a controlled purchase of 375 30-milligram Oxycodone pills at $16 a pill for a total price of $6,000. The DEA supplied Valmyr with the money for the purchase. After the meeting, Valmyr turned over the 375 30-milligram pills and the recording device to Burt. The pills were packaged in an amber bottle.

On October 25, 2012, Valmyr, equipped with a DEA recording device (and wire) and acting under DEA direction, met with Adirika. Valmyr made a controlled purchase of 375 30-milligram Oxycodone pills for $6,000 or $16 a pill.

10

The DEA supplied Valmyr with the money for the purchase. After the meeting, Valmyr met with the DEA agents and turned over the recording device and the 375 30-milligram Oxycodone pills. The pills were packaged in foil.

On March 7, 2013, Valmyr, equipped with a DEA recording device (and wire) and acting under DEA direction, attempted to make a final controlled purchase of Oxycodone from Richard and Adirika. Valmyr telephoned Richard and informed him that he had located "someone who needs some stuff." Richard responded by directing Valmyr to the pharmacy where Adirika worked. Valmyr and Richard did not discuss how many pills would be purchased, but Valmyr assured Richard that he would compensate him for his role in the drug sale.

Before Valmyr went to the pharmacy, the DEA gave Valmyr $6,000 in official funds to use for the attempted purchase. Valmyr also wore a DEA recording device (and wire) to the meeting. When Valmyr arrived at the pharmacy, he discussed the purchase of 200 30-milligram Oxycdone pills with Adirika. Adirika chided Valmyr that he was supposed to be accompanied by his "cousin" Richard when he visited her. Adirika and Valmyr then left the pharmacy and went to Adirika's residence to complete the sale. After completing the sale, Valmyr left Adirika's residence, met with DEA agents, and turned over the recording device (with the wire) and the 200 30-milligram Oxycodone pills that he had just purchased. The pills were packaged in aluminum foil.

11

After Valmyr's final Oxycodone purchase on March 7, 2013, the agents did not dispatch Valmyr to make further purchases of Oxycodone pills from Richard or Adirika. The DEA remained in contact with Valmyr by holding debriefings with him "[e]very 90 days at a minimum." On November 6, 2014, agents arrested Richard and Adirika.

## B.    Tape Recordings and Transcripts

Following the defendants' arrest, the DEA collected the recordings of the defendants' conversations with Valmyr. Throughout these recordings, Valmyr sometimes spoke to Richard in Creole, a language that Burt, Bryson, Betancourt, and Adirika did not speak. The government sent the audio of the recordings "away to be translated" at the Utah National Guard Joint Language Training Center (the "translation center"). The translation center translated the audio recordings from Creole into English and produced written transcripts of the translations. The government then retained a Creole translator, Philippe Chany, who performed an independent review of the transcripts. Chany read the transcripts, listened to all of the audio recordings, compared the transcripts to the audio recordings, and made three "very minor" changes to the transcripts. Chany used a headset to assist with hearing the audio recordings and "would rewind and play [an audio recording] again" if any phrase was "not [] clear on the first pass." After making the minor changes to the transcripts, Chany testified that he had reviewed "all of the

12

documents" for the purpose of "making sure what I was hearing corresponded to what was being written down." Chany testified that the he had completed his review for each exhibited transcript, and Chany answered in the affirmative when asked whether the exhibited transcripts "accurately reflect[ed] the three changes [he] made."

## C.    Valmyr's Arrest and Subsequent Unavailability

On November 12, 2014, the district court held an arraignment for the defendants. Following arraignment, the district court set a joint trial date for the defendants of April 13, 2015.

On April 8, 2015, just days before trial, the DEA arrested Valmyr for trafficking in three kilograms of cocaine without authorization. Agents found that Valmyr had been carrying $90,000 in cash in an attempt to make an unauthorized purchase of cocaine.

On April 8, 2015, the prosecutor notified the district court and defense counsel of Valmyr's arrest. On April 9, 2015, the defendants filed a joint motion to continue the trial.

On April 10, 2015, the district court held a hearing regarding the motion to continue the trial. At the hearing, the government informed the district court that they would not be calling Valmyr as a witness in their case-in-chief. The defense still wished to reserve the right to call Valmyr as a witness for the defense's case.

The district court did not rule as to whether Valmyr would testify. However, in light of Valmyr's arrest, the district court ordered the government to turn over to the defense all details regarding the government's investigation of Valmyr and Valmyr's deactivation as a confidential informant. The district court then granted the motion to continue the trial. The district court postponed the start of trial until April 27, 2015.

On April 28, 2015, amidst voir dire of the jury, the defense filed a Joint Petition for Writ of Habeas Corpus Ad Testificandum for Valmyr, seeking to compel his testimony. The district court granted the petition and issued the writ to have Valmyr produced in the courtroom for trial.

On April 29, 2015, the government opened its case-in-chief. The government's first three witnesses testified. The district court then excused the jury and held a conference with the parties to discuss Valmyr's potential testimony.

At the conference, Valmyr's personal attorney advised the district court that, due to his recent arrest, his client would be asserting his Fifth Amendment right to remain silent. Valmyr's counsel noted that the government had decided not to offer Valmyr immunity from prosecution. The district court directed the defense to question Valmyr outside the presence of the jury to determine if he, in fact, would invoke his Fifth Amendment rights. The defense counsel did so, and Valmyr invoked his right to remain silent. Based on Valmyr's invocation, the district court

14

determined that Valmyr was "unavailable" to testify. The district court notified the defense that it would get "all the appropriate impeachment that [it could] get" of Valmyr through "cross examination."

At trial, the defense attempted to impeach Valmyr through cross examination of Burt and Bryson. For example, the defense cross examined Burt, who testified that Valmyr "was caught with three kilos of cocaine," was found with "$90,000 in cash" for a purchase that "[h]e was not authorized . . . to make," and was "deactivated" as a confidential informant. The defense also cross examined Bryson, who testified that "[o]n April 8, 2015, . . . Valmyr was arrested" because "[h]e had $90,000 in currency and . . . wanted to buy 3 kilos of cocaine."

## D.    The Tapes and Transcripts of Valmyr's Interactions with the Defendants

As part of its case in chief, the government sought to introduce into evidence the tapes and transcripts of Valmyr's recorded interactions with the defendants. The government called Chany as a witness, who testified and faced cross examination as to his certification of the transcripts' accuracy.

The defendants challenged the admission of the tapes and transcripts as a violation of their Sixth Amendment right to confront witnesses against them. The government defended the admissibility of the tapes and transcripts on the grounds that the testimony of Chany, who had listened to the recordings and performed an independent review of the transcripts, sufficed.

15

The district court admitted the tapes and transcripts. The district court also

gave the jury a special instruction concerning the nature of the transcription

process:

> I admit these transcripts for the limited and secondary purpose
> of helping you follow the content of the conversation as you
> listen to the tape recordings, particularly those portions spoken
> in Creole, and also to help you identify the speakers.
>
> You are specifically instructed that <u>whether the
> transcript correctly reflects the content of the conversation</u>
> or the identity of the speakers is entirely up to you to decide
> based on your evaluation of the testimony, <u>what you have heard
> about the preparation of the transcripts, as well as your own
> examination of the transcript in relation to hearing the tape
> recording itself as the primary evidence of its own contents.
> If you determine that the transcript in any respect is
> incorrect or unreliable you should disregard it to that extent</u>.
> . . .
>
> Do not let the fact that it was in another language other than
> English influence you in any way.
>
> Now, if any of you understand Creole you must disregard
> completely what the witness has said in his or her language,
> your own interpretation, and consider as evidence only what is
> provided by the interpretation into English. If one of you who
> speaks Creole believes the interpreter has made a mistake you
> may bring it to the attention of the Court, but you should make
> your deliberations on the basis of the official interpretation.

## E.    The Defendants' Requested Jury Instructions

At trial, the defense argued that the government entrapped the defendants,

convincing them to commit offenses they would not have otherwise committed. As

16

part of the defense strategy, the defense attempted to cast doubt on the DEA's control of Valmyr during its investigation of the defendants.

At the close of the evidence, the defense requested that the district court give the jury a "missing witness instruction" based on Valmyr's refusal to testify. Defense counsel said that such an instruction would tell the jury that the government failed to "call a witness that was peculiarly within their power to immunize." The defense also submitted an additional jury instruction which would have stated that Valmyr had invoked his Fifth Amendment privilege, had been subpoenaed by the defendants to testify, and had refused to answer questions about his role as an informant.

The district court declined to give both the "missing witness" instruction and the defense's requested instruction concerning Valmyr's Fifth Amendment invocation. The district court explained its decision on the grounds that "[n]either side in a criminal litigation has the right to benefit from any inference a jury may draw from a witness' assertion of the Fifth Amendment privilege," citing United States v. Johnson, 488 F.2d 1206 (1st Cir. 1973). The district court stated:

> I will not give an instruction either to the missing witness nor will I give an instruction advising the jury that Mr. Valmyr has asserted his Fifth Amendment right. Neither party can discuss Mr. Valmyr's situation other than he is under arrest for doing the very thing he had promised DEA he would not do.

17

Following denial of these two requested jury instructions, the defense then asked the district court to provide an entrapment jury instruction to the jury. The district court responded by offering the standard pattern jury instruction on entrapment to the defense. The defense sought to modify the standard pattern jury instruction because it wanted each of the two defendants to be specifically named in the instruction. The district court agreed to do so. At the close of the trial, the district court provided the following entrapment jury instruction, with the defense's requested changes, to the jury:

> Defendant Antonio Richard and Defendant Ifemmuta Adirika have both claimed to be victims of entrapment regarding the charged offenses. The law forbids convicting an entrapped defendant.
>
> But there is no entrapment when a defendant is willing to break the law and the Government merely provides what appears to be a favorable opportunity for the defendant to commit a crime.
>
> For example, it's not entrapment for a Government agent to pretend to be someone else and offer - directly or through another person - to engage in an unlawful transaction.
>
> So a defendant isn't a victim of entrapment if you find beyond a reasonable doubt that the Government only offered the defendant an opportunity to commit a crime the defendant was already willing to commit.
>
> But if there is a reasonable doubt about whether a defendant was willing to commit the crime without the persuasion of a Government officer or a person under the

18

Government's direction, then you must find the defendant not guilty.

Following the district court's charges to the jury and the jury's deliberations, the jury convicted the defendants on all counts. We now turn to the defendants' claims on appeal.

## III.    ENTRAPMENT

On appeal, the defendants argue that the government failed to provide sufficient evidence for a reasonable jury to conclude that the defendants were predisposed to commit their offenses prior to the government's alleged entrapment.

## A.    Standard of Review

"[E]ntrapment as a matter of law is a sufficiency of the evidence inquiry" which we review de novo, "view[ing] all facts and mak[ing] all inferences in favor of the government." United States v. King, 73 F.3d 1564, 1568 (11th Cir. 1996) (quoting United States v. Brown, 43 F.3d 618, 622 (11th Cir. 1995)). We limit our review to "whether the evidence was sufficient to enable a reasonably-minded jury to reach the conclusion [beyond a reasonable doubt] that the defendant was predisposed to take part in the illicit transaction." United States v. Aibejeris, 28 F.3d 97, 99 (11th Cir. 1994) (quoting United States v. Ventura, 936 F.2d 1228, 1230 (11th Cir. 1991)).

## B.    General Principles

"Predisposition . . . refers to the likelihood that the defendant would have committed the crime without the government's invention, or actively wanted to but hadn't yet found the means." United States v. Mayfield, 771 F.3d 417, 441 (7th Cir. 2014). Predisposition "is measured prior to the government's attempts to persuade the defendant to commit the crime." Id. at 436. The element focuses on whether the defendants were "unwary innocent[s]" or, instead, "unwary criminal[s]" who "readily availed [themselves] of the opportunity to perpetrate the crime." Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 886 (1988)

"This Court has rejected the notion that the predisposition analysis is one that occurs against a backdrop of fixed, enumerated factors; instead, it has held that it is a necessarily fact-intensive, subjective inquiry into a defendant's state of mind." United States v. Isnadin, 742 F.3d 1278, 1298 (11th Cir. 2014). In prior entrapment cases, this Court has considered "evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so," Brown, 43 F.3d at 625, "prior related offenses," id., and "post-crime statements." United States v. Andrews, 765 F.2d 1491, 1499 (11th Cir. 1985).

## C.    Richard's Predisposition

In this case, sufficient evidence supports the conclusion that the defendants were predisposed to commit their Oxycodone offenses. On May 23, 2012, Valmyr

first informed the DEA that he had received an Oxycodone pill from Richard. At that point, Valmyr was nothing more than a "tipster" for the DEA, and the DEA was unaware that Valmyr had even gone to visit Richard. The fact that Valmyr obtained an Oxycodone pill from Richard without any DEA knowledge of the visit supports a reasonable inference that Richard furnished the pill free of any concerted government design.

Notwithstanding this, ample additional evidence suggests that Richard was already involved in an Oxycodone distribution scheme prior to any targeted government action. For example, on June 6, 2012, just a few days after Valmyr had first obtained an Oxycodone pill from Richard, Betancourt met with Richard. Betancourt offered Richard identifications and prescription pads—items that would be highly useful for a new, would-be drug dealer who wanted to obtain Oxycodone. However, Richard rejected the offer and suggested that he already had a consistent supplier who "kn[ew] the streets." Moreover, although Richard had ample opportunity to pull out of the drug conspiracy during the course of the DEA's investigation, he continued to participate in multiple separate controlled buys from the DEA between June 2012 and March 2013. The evidence as to Richard's actions and attitude throughout the course of the DEA investigation thus corroborate his predisposition to commit the offenses prior to DEA involvement.

21

**D.    Adirika's Predisposition**

Similarly, the evidence suggests that Adirika was predisposed to facilitating a large-scale Oxycodone distribution scheme. Before the DEA ever directly observed Adirika, Richard informed the DEA that his supplier was a female pharmacist, of African descent, who once lived in New Jersey—a description that matches Adirika. On May 22, 2012, prior to DEA observation of Adirika, Valmyr told DEA agents that he had procured an Oxycodone pill at a residence later recognized as Adirika's home. On June 6, 2012, prior to DEA observation of Adirika, Richard told Valmyr and an undercover DEA agent (Betancourt) that Adirika already had the necessary prescription pads and identifications for the sale of Oxycodone.

The DEA first observed Adirika at a controlled buy with Richard on June 15, 2012. When Valmyr showed up unannounced at Adirika's home for the controlled buy, Adirika allowed Richard to sell Valmyr $600 in Oxycodone in the home. At the controlled buy, Richard talked about the large inventory of Oxycodone pills at Adirika's home that "we" already have: 2,000 30-milligram pills and 200 80-milligram pills. Adirika does not deny this.

Moreover, Adirika also participated in numerous controlled buys of Oxycodone without protest, despite multiple opportunities to back out or to stop the sales. Indeed, at the September 7, 2012 meeting between Adirika and Valmyr,

22

Adirika initiated the discussion about a drug transaction by first asking Valmyr whether he had brought identifications. When Adirika found out that Valmyr had not brought them, Adirika reprimanded Valmyr and told him that she might have to pay a higher price for the identifications from a "crackhead on the street."

Richard's references to Adirika's involvement, prior even to the DEA's identification of her, combined with Adirika's repeated participation in subsequent buys, provide sufficient evidence that she was predisposed to commit her offenses. Valmyr did not need to use repeated and persistent requests to purchase Oxycodone from Adirika. Instead, Adirika demonstrated openness to Oxycodone sales on the first available occasion (June 15, 2012), and she continued to support and even initiate sales in subsequent transactions.

## IV.    CONFRONTATION CLAUSE

We now turn to the defendants' claim that the introduction of certain transcripts, which were translated from Creole into English, violated the defendants' Sixth Amendment right to confront the witness against them.

### A.    Standard of Review

This Court reviews de novo a preserved Confrontation Clause claim. United States v. Curbelo, 726 F.3d 1260, 1271-72 (11th Cir. 2013). We review de novo "whether hearsay statements are testimonial for purposes of the Confrontation Clause." United States v. Carballo, 595 F.3d 1214, 1226 (11th Cir. 2010). A

23

Confrontation Clause error requires reversal unless the government can prove that the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).

## B.    General Principles

The Confrontation Clause to the Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36, 59, 124 S.Ct. 1354, 1368 (2004), the Supreme Court held that the Confrontation Clause allows the admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the declarant]." Id., 124 S. Ct. at 1369.

Testimonial statements are the "functional equivalent" of in-court testimony and are statements "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52, 124 S. Ct. at 1364. The Supreme Court has held that forensic reports and laboratory certifications may be "testimonial" for purposes of the Confrontation Clause. See Bullcoming v. New Mexico, 564 U.S. 647, 665, 131 S. Ct. 2705, 2717 (2011) (holding a certification of the blood alcohol content of a sample to be testimonial); Melendez-Diaz v. Massachusetts, 557 U.S.

24

305, 310-11, 129 S. Ct. 2527, 2532 (2009) (holding that a certification that material seized by the police included cocaine was testimonial). This Court has further held that autopsy reports produced by licensed medical practitioners may include testimonial statements. See United States v. Ignasiak, 667 F.3d 1217, 1232 (11th Cir. 2012).

In cases involving the use of a translator, the question of who "makes" a statement—whether the original speaker or the translator—is relevant to the Confrontation Clause analysis. In United States v. Curbelo, this Court held that a translator who was "not the original translator" can—in certain circumstances— serve as the "'witness[] against' [the defendant] under the Sixth Amendment." 726 F.3d 1260, 1276 (11th Cir. 2013).

## C.    Curbelo

In Curbelo, the government introduced as evidence English-language transcripts of the defendant's recorded cell-phone conversations. Id. at 1265. The majority of the original conversations occurred in Spanish. Id. The person who prepared the English-language transcripts did not testify, so the defendant raised a Confrontation Clause challenge as to the admission of the transcripts. Id.

At trial, the government established the accuracy of the English-language transcripts through the testimony of a third party, Jose Diaz. Id. at 1264-65. Diaz did not prepare the English-language transcripts; however, Diaz spoke both

25

English and Spanish and was a party to the original conversations made by the defendant (in Spanish). Id. at 1265, 1276. To certify the transcripts, Diaz performed an "independent review of the recordings and transcripts"; Diaz testified that "he had listened to the recordings, reviewed the transcripts, and believed the transcripts to be accurate reflections of the recordings." Id. at 1274-75.

The Curbelo Court held that Diaz's independent review and testimony resolved the Confrontation Clause issue. The Court recognized that "the transcripts were the translator's work product, not Diaz's," and that "Diaz did not start from scratch in translating the conversations." Id. However, the Court explained that the government "did not introduce the transcripts on the weight of the translator's certification, but on Diaz's testimony." Id. at 1274. Put another way, the government only used "Diaz's live testimony . . . to support the transcript's accuracy" and did not rely on any statement by the original translator. Id. at 1274-75. Furthermore, Diaz's "testimony was based on firsthand comparison of the recordings and the transcripts." Id. at 1275.

Because Diaz had "listened to the recordings, reviewed the transcripts," and "independently confirmed the transcripts' accuracy," Diaz had therefore become, for Confrontation Clause purposes, the "witness" against the defendant as to the accuracy of the transcripts. Id. at 1275-76. "Diaz did not need to sit down with pencil and paper and start the translation process anew." Id. at 1275. Rather, Diaz,

26

as the last to review the transcripts, "had the ultimate say over the content of the transcripts, making him the final translator . . . [and] thus the witness." Id. (quoting United States v. Sardinas, 386 F. App'x 927, 942 (11th Cir. 2010)). And because Diaz testified, allowing the defense to cross examine him on "his language expertise, his biases, and the translation's accuracy," the Court held that the defendants had received their constitutional right to confront the "witness" against him. Id. at 1276. The Court emphasized that the "Confrontation Clause makes no distinction between accurate and inaccurate testimony; it only insists that testimony be subject to cross-examination." Id. at 1275. "[B]ecause Diaz . . . was the witness . . . under the Sixth Amendment," and because Diaz was cross examined, "the admission of the transcripts through Diaz's testimony did not violate the Confrontation Clause." Id. at 1276.

## D.    Discussion

This case presents facts similar to those in Curbelo. The government seeks to introduce English-language transcripts of audio recordings that have been translated from another language—in this case, Creole—into English. Similarly, the government relies exclusively on the certification of a third party to confirm the accuracy of the English-language transcripts. Unlike Diaz in Curbelo, the third party in this case, Chany, was not a party to the original recorded conversations. However, Curbelo did not hold this fact to control the issue. Rather, Curbelo held

27

that a third party's independent, firsthand review of the recordings and transcripts for accuracy, combined with the third party's availability to the defendant for cross-examination, suffices for purposes of the Confrontation Clause. See id. at 1276.

Here, Chany testified that he listened to the original audio recordings, compared those recordings to the transcripts generated by the Utah translation center, and confirmed the transcripts' accuracy. The government only offered the transcripts that were subjected to Chany's independent review. Chany testified to the accuracy of the transcripts' entire contents and even offered a few minor edits, which were included in the transcripts proffered to the district court.

"[I]t is not the case, that anyone whose testimony may be relevant in establishing the chain of custody . . . of the sample . . . must appear in person as part of the prosecution's case." Melendez-Diaz, 557 U.S. at 311 n.1, 129 S. Ct. at 2532 n.1. Because Chany served as the "witness" as to the transcripts' accuracy, and because Chany testified, the defendants' Sixth Amendment rights were not violated.

## V.    DISTRICT COURT TREATMENT OF VALMYR'S UNAVAILABILITY

On appeal, the defendants challenge the district court's decision not to give a missing witness instruction, as well as an instruction concerning Valmyr's invocation of his Fifth Amendment rights. The defendants argue that the district

28

court abused its decision in declining to give these instructions. The defendants additionally argue that the district court's refusal to give these instructions impaired their ability to present a complete defense, in violation of their constitutional rights.

## A.     Standard of Review

We review "a district court's refusal to give a jury instruction requested by the defense for abuse of discretion." United States v. Dulcio, 441 F.3d 1269, 1275 (11th Cir. 2006). We will not reverse the district court unless the requested jury instruction: "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." Id. (quoting United States v. Brazel, 102 F.3d 1120, 1139 (11th Cir. 1997)).

Constitutional errors are reviewed de novo, United States v. Holt, 777 F.3d 1234, 1261 (11th Cir. 2015), and require reversal unless the government can show that the error was harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24, 87 S. Ct. at 828.

## B.     General Principles

"When a witness is peculiarly within the control of one party, and the witness' testimony would elucidate facts in issue, an instruction is appropriate

regarding the permissible inference which the jury may draw from the party's failure to call the witness." United States v. Nahoom, 791 F.2d 841, 846 (11th Cir. 1986).  However, "[t]he long-standing rule in this circuit is that any inference from a party's failure to call a certain witness equally available to both parties is impermissible."[2] United States v. Chapman, 435 F.2d 1245, 1247 (5th Cir. 1970) (emphasis added) (finding that no inference was permitted from the absence of witnesses who were available neither to the prosecution nor to the defense). "Ordinarily no inferences are permitted as a result of the failure to call to the witness stand one whose testimony would be privileged." McClanahan v. United States, 230 F.2d 919, 926 (5th Cir. 1956).

"This court has not yet addressed the issue of whether the government's refusal to grant immunity to a witness may serve as a basis for a missing witness instruction." United States v. Raphael, 487 F. App'x 490, 500 (11th Cir. 2012). However, "every circuit to have considered this question has held that the government's mere ability to grant immunity, without more, 'does not make a witness who invokes the Fifth Amendment right not to testify peculiarly available to the government.'" Id. (quoting United States v. Rios, 636 F.3d 168, 171 (5th Cir. 2011)); see, e.g., United States v. Myerson, 18 F.3d 153, 158-60 (2d Cir. 1994);

---

[2]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

United States v. St. Michael's Credit Union, 880 F.2d 579, 597-98 (1st Cir. 1989);

United States v. Brutzman, 731 F.2d 1449, 1453-54 (9th Cir. 1984).

## C.    Missing Witness Instruction

The district court did not abuse its discretion in declining to give a missing

witness instruction because Valmyr's Fifth Amendment invocation rendered him

equally unavailable to both the government and the defense. See Chapman, 435

F.2d at 1247.

Additionally, the trial evidence here provided ample opportunity for the jury

to draw its own conclusions as to why Valmyr was "missing." On several

occasions, Burt and Bryson both testified that Valmyr was recently arrested for

dealing in cocaine. Burt's testimony also showed that Valmyr had been deactivated

as a confidential informant. In light of this, the lack of a missing witness

instruction did not "concern[] an issue so substantive that its omission impaired the

accused's ability to present a defense." See Dulcio, 441 F.3d at 1275.

## D.    Instruction Regarding Valmyr's Fifth Amendment Invocation

Neither did the district court abuse its discretion in declining to give a jury

instruction concerning Valmyr's invocation of his Fifth Amendment rights. Again,

because we do not permit parties to draw inferences from a witness' invocation

where such an invocation renders the witness equally unavailable to both parties,

31

see Chapman, 435 F.2d at 1247, the district court was well within its discretion not to give such an instruction here.

## E.  The Lack of Requested Instructions Did not Create Constitutional Error

Moreover, the district court did not deprive the defendants of their constitutional rights by declining to give the requested jury instructions.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986)). The defense received ample opportunity to do so here. At all relevant times, the defense could call witnesses and cross-examine each of the government's witnesses. Although the defense may have wished to specifically call Valmyr, the government did not gain a trial advantage on account of Valmyr's unavailability because Valmyr was equally unavailable to the parties. And even if impeachment of Valmyr was an important element of the defense's case, the defense had the opportunity to cross examine multiple government witnesses about Valmyr's arrest and unreliability as a confidential informant. Indeed, the defense did so in its cross examination of both Burt and Bryson. Given

32

these facts, we cannot say that Valmyr's unavailability deprived the defendants of their constitutional rights by impairing their ability to present a complete defense.

## VII.   SUFFICIENCY OF THE EVIDENCE AS TO RICHARD'S CONVICTION

Richard raises an additional claim not adopted by Adirika in her appellate brief. Richard argues that, irrespective of entrapment, the government failed to produce sufficient evidence to support Richard's Oxycodone conspiracy and possession convictions. Richard argues that the district court should have granted his Rule 29 motion and that it should now vacate his convictions.

### A.   Standard of Review

This Court reviews de novo a challenge to the sufficiency of the evidence. United States v. Charles, 313 F.3d 1278, 1284 (11th Cir. 2002). We view the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict. United States v. Jiminez, 564 F.3d 1280, 1284 (11th Cir. 2009).

### B.   General Principles

To sustain a conspiracy conviction, the government must prove an agreement among two or more persons to distribute drugs, the defendant's knowledge of the conspiracy's goal, and the defendant's knowing and voluntary participation in the venture. United States v. Reeves, 742 F.3d 487, 497 (11th Cir. 2014); United States v. Brown, 587 F.3d 1082, 1089 (11th Cir. 2009).  The

33

government must provide "substantial evidence that each alleged conspirator knew of, intended to join and participated in the conspiracy." United States v. Avila-Dominguez, 610 F.2d 1266, 1271 (5th Cir. Feb. 1980). The government informant cannot serve as the sole co-conspirator. See United States v. Lively, 803 F.2d 1124, 1126 (11th Cir. 1986). "Conspiracy may be proven by circumstantial evidence and the extent of participation in the conspiracy or extent of knowledge of details in the conspiracy does not matter if the proof shows the defendant[s] knew the essential objective of the conspiracy." United States v. Gupta, 463 F.3d 1182, 1194 (11th Cir. 2006) (internal quotation marks omitted).

To sustain a conviction for possession with intent to distribute drugs, "the government must show that the defendant had (1) knowing (2) possession of the drugs and (3) an intent to distribute them." United States v. Capers, 708 F.3d 1286, 1297 (11th Cir. 2013).

## C.   The Government Presented Substantial Evidence to Support Richard's Conspiracy Conviction

Richard argues that there is no evidence of an agreement between Richard and Adirika sufficient to support a conspiracy. Richard suggests that, at the first controlled buy in which Richard and Adirika were present together (on June 15, 2012), Adirika was not aware that Valmyr was going to show up at the residence. Richard thus suggests that Adirika could not have been aware of an apparent Oxycodone conspiracy with Richard. As to the later controlled Oxycodone buys on

34

July 30, 2012, September 7, 2012, October 25, 2012, and March 7, 2013, Richard argues that he was either not present at the controlled buys or did not actively participate in them.

However, the government presented substantial evidence that Richard participated with Adirika in an Oxycodone-distribution conspiracy from June 2012 through March 2013. As early as June 6, 2012, Richard mentioned to the DEA that he had a relationship with a female Oxycodone supplier whose description matched that of Adirika. At Valmyr's June 15, 2012 meeting with Richard and Adirika, Richard told Valmyr that "we have 2,000 [pills] in the 30s, 200 [pills] in the 80s." Richard also said—with Adirika present—that "[s]he can't give them the stuff that she already ordered for - - for the guys." Perhaps most tellingly, on March 7, 2013, when Valmyr asked Richard about a possible Oxycodone purchase, Richard directed Valmyr to Adirika's pharmacy and sought compensation from Valmyr as part of facilitating an Oxycodone sale through Adirika.

Adirika's apparent silence at some of these meetings does not negate a reasonable inference that she had knowledge sufficient to serve as a co-conspirator in Richard's Oxycodone conspiracy. We have previously affirmed a conspiracy conviction "when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." United States v. Vernon, 723 F.3d 1234, 1273-74 (11th Cir.

35

2013) (quoting United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006)).

Richard and Adirika were present together for controlled buys of Oxycodone on multiple occasions, and the government presented additional evidence of coordination between the two in establishing buys when the other co-defendant was not present. Substantial evidence thus supports Richard's conspiracy conviction.

## D.    The Evidence Supports Richard's Drug Conviction

So, too, does the evidence support Richard's conviction for possession of Oxycodone with intent to distribute. Richard challenges the government's evidence on the basis that there is no express video recording showing an exchange of pills. Richard argues that the audio recordings of Richard's transactions, on their own, could not support an inference that Richard actually possessed the pills.

Richard's argument is without merit. On June 15, 2012 Valmyr met with Richard and discussed a purchase of ten 80-milligram Oxycodone pills. Prior to this meeting, Bryson searched Valmyr and made sure that he was not carrying any pills. Just after Valmyr met with Richard, Bryson again searched Valmyr. Bryson's subsequent searched revealed that Valmyr had acquired ten 80-milligram Oxycodone pills. Drawing all reasonable inferences in favor of the government, as

we are required to do here, sufficient evidence thus supports the finding that

Richard knowingly possessed Oxycodone pills with the intent to distribute them.[3]

## VIII.  CONCLUSION

For all of these reasons, we affirm the defendants' convictions and

sentences.

**AFFIRMED.**

---

[3]The defendants also argue that the cumulative effect of two or more of the above errors merits a new trial. See United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005). The cumulative error doctrine recognizes that the "cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error." Id. "In addressing a claim of cumulative error, [the Court] must examine the trial as a whole to determine whether the appellant[s] [were] afforded a fundamentally fair trial." United States v. Lopez, 590 F.3d 1238, 1258 (11th Cir. 2009). If there are no errors or only a single error, there cannot be any cumulative error. United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011). Because we conclude that there is no error in this case, there is no cumulative error.