[DO NOT PUBLSIH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10992

_____

D.C. Docket No. 1:17-cr-20282-CMA-7

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MULLER TERCIER,
a.k.a. Mike,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 13, 2020)

Before MARTIN, GRANT, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Muller Tercier appeals his conviction and sentence for conspiring to possess

with the intent to distribute five kilograms or more of cocaine in violation of 21

U.S.C. §§ 841(a)(1) and 846. After careful review and with the benefit of oral argument, we affirm his conviction and sentence.

## I.    FACTUAL AND PROCEDURAL HISTORY

In April 2017, a grand jury returned an indictment charging Tercier and nine other defendants with conspiracy to possess with intent to distribute five hundred grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. A grand jury subsequently returned a superseding indictment again charging Tercier and a codefendant with conspiracy to possess with intent to distribute cocaine, this time in an amount of five kilograms or more. In November 2017, the case proceeded to trial.

During voir dire, the government exercised a peremptory strike on prospective juror 17. Tercier, an African-American man of Haitian descent, objected to the strike and described the prospective juror as "apparently of Haitian descent." Tercier asked the government for a race-neutral reason for the strike. The government responded that the prospective juror, a college student, was too young and too disengaged in the proceedings to be a juror in the case.[1] The government also noted that "there are a number of African-American jurors or that appear to be African-American jurors who the government has accepted at this point."

---

[1] During voir dire, the government sought to strike another student for cause due to that potential juror's exam schedule.

In response, the district court brought the prospective juror back for more questioning, and the prospective juror was asked about his college major, his favorite television show, and whether his exam schedule would interfere with the trial. The prospective juror never stated his ethnicity or national origin on the record. The government admitted that the prospective juror was more engaged than before but reiterated that "he doesn't really have substantial life experience." Tercier argued that the government's reason was a pretext. The district court granted the strike and ruled that "the [g]overnment has provided sufficient reason to exercise a peremptory with regard to [prospective juror 17] and has provided a race-neutral reason."

At trial, the government argued that Tercier was part of a cocaine trafficking conspiracy in South Florida. The government asserted that Tercier and his primary co-conspirators, Richard Lavalliere and Kevens Duroseau, delivered and sold imported cocaine, communicating via coded conversations and burner phones. After Lavalliere caught the attention of law enforcement, drug-enforcement authorities used wiretaps and onsite surveillance to investigate Lavalliere. The government wiretapped eighty-six conversations between Lavalliere and Tercier and twenty-five conversations between Lavalliere and Duroseau. The government introduced these wiretap recordings into evidence and introduced transcripts in English of selected wiretap sessions as several of those wiretap sessions recorded conversations in Creole. Tercier never objected to the accuracy of the English translations at trial.

Special Agent Dearl Weber, a government witness, testified to both the translation verification process and the accuracy of the transcripts.

During its case in chief, the government focused on a September 26, 2014, hand-to-hand transaction between the conspirators and elicited testimony from surveilling officers Detective Kenny Veloz, Detective Yaniel Hernandez, and Special Agent Weber. The day before the September 26, 2014, transaction, Lavalliere called Duroseau asking for two to four kilograms of cocaine. Lavalliere paid for the cocaine that day and arranged for Duroseau to deliver the drugs the next day.

During trial, the government presented the following timeline for the September 26 events. At 9:57 a.m., Duroseau informed Lavalliere that he had the cocaine. At 10:22 a.m., Duroseau delivered the cocaine to Lavalliere's house. At 12:00 p.m., Lavalliere told Tercier that he received "two [kilograms] this morning." At 12:44 p.m., Lavalliere called Tercier, telling Tercier that he would leave his house in "15 minutes." Lavalliere arrived at Tercier's autobody shop at 1:19 p.m., quickly gave Tercier a package with the cocaine, and departed moments later. Tercier was not photographed during the transaction.

Lavalliere and Duroseau testified for the government. Regarding the September 26 transaction, Lavalliere could not remember whether he was delivering drugs to or solely picking up money from Tercier. But Lavalliere testified that he and Tercier "dealt" eight to eleven kilograms of cocaine within the six months prior

to Lavalliere's arrest.  Lavalliere and Duroseau also explained the meanings behind the coded conservations.  Special Agent Christopher Mayo, the government's only expert witnesses, also testified about the coded conversations.

At trial, Tercier argued that he used the coded language in both drug-related and non-drug-related conversations alike.  To rebut this claim, the government elicited testimony from Lavalliere and Forensic Examiner Ricardo Soto.  The government also produced evidence obtained from a warrantless search of a cellphone owned by a third party who had sold Tercier construction-related materials.  The testimony and cellphone content showed that these conversations were devoid of coded language.

Tercier vigorously cross-examined the government's witnesses, especially Lavalliere.  After the government rested, Tercier moved for a judgment of acquittal and argued that the government did not produce any evidence of a conspiracy.  The district court denied Tercier's motion for judgment of acquittal.  During closing arguments, Tercier argued that the government did not show "any type of illegal activity or any other activity for that matter."

Tercier objected to the transcripts of the wiretap conversations being allowed into the jury room.  Tercier argued that the transcripts should not be sent to the jury room because the wiretapped recordings themselves were the actual evidence, not the

5

transcripts. The district court overruled Tercier's objection and provided the following jury instruction:

> [Certain exhibits] have been identified as typewritten transcripts and partial translations from Haitian Creole to English of the oral conversations heard on the recordings received in evidence . . . . The transcripts also purport to identify the speakers engaged in the conversations. I have admitted the transcripts for the limited and secondary purpose of helping you follow the contents of the conversations as you listen to the tape recordings, particularly those portions spoken in Haitian Creole, and also to help you identify the speakers.

> You are to accept the provided English translations of the Haitian Creole, but you are specifically instructed that whether the transcripts correctly reflect the contents of the English language conversations or the identities of the speakers is entirely for you to decide based on your own evaluation of the testimony you have heard, about the preparation of the transcripts, and from your own examination of the transcripts in relation to hearing the tape recordings themselves as the primary evidence of their own contents.

On December 6, 2017, the jury found Tercier guilty of conspiracy to possess with intent to distribute at least five kilograms of cocaine.

In a January 9, 2018, presentence investigation report ("PSI"), the probation officer determined that Tercier should not be eligible for an acceptance-of-responsibility adjustment because Tercier fundamentally denied his guilt throughout trial. The PSI also indicated that safety-valve relief was not available to Tercier because he had not provided a safety-valve statement. Tercier objected to the PSI, arguing that he was entitled to an acceptance-of-responsibility adjustment because he

6

only went to trial to contest the quantity of the drugs. Regarding safety-valve relief, Tercier provided the following statement on January 29, 2018:

> I, Muller Tercier, admit I was involved in the sale of cocaine in the Southern District of Florida. I received a total of a little less than 2 kilos of cocaine from May to November, 2014, from my business associate, Richard Lavalliere. Then I sold the cocaine by the ounce or grams to others. I knew this was wrong when I did it. I apologize to the Court and the government for my actions. I also apologize to my family.

The government responded that this admission differed from the jury's factual findings and noted that Tercier had previously given the government false information on two separate occasions before his conviction, i.e., at his arrest and after an incident concerning a co-defendant.

In February 2018, the district court conducted a sentencing hearing over the course of two days. The district court expressed surprise at Tercier's argument that the only reason he went to trial was to dispute the quantity of drugs, stating that it "never heard any of that before or during trial by Mr. Tercier." At the conclusion of the first day of the sentencing hearing, the district court denied Tercier's request for an acceptance-of-responsibility adjustment. Prior to the second day of sentencing, Tercier was given the opportunity to meet with the government in order to provide another safety-valve statement. On the second day of sentencing, Tercier took the witness stand, and the district court found his in-court statements truthful and complete and granted him safety-valve relief. The district court sentenced Tercier

to eighty-three months' imprisonment, five years of supervised release, and a $100 special assessment. This timely appeal ensued.

## II. ANALYSIS

On appeal, Tercier raises six arguments: (1) the government presented false testimony regarding the September 26 drug transaction, in violation of *Giglio v. United States*, 405 U.S. 150 (1972); (2) the district court improperly allowed the government to strike a purportedly Haitian prospective juror, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); (3) the district court erred in admitting evidence obtained from a warrantless search of a third party's cellphone, in violation of *Riley v. California*, 573 U.S. 373 (2014); (4) the district court erred in submitting transcripts of wiretapped conversations to the jury and directing the jury to accept the Creole-to-English transcript translations as accurate; (5) the district court committed cumulative error when it admitted present sense impression statements, lay opinion evidence, expert testimony, and allowed witness bolstering; and (6) the district court erred in declining to reduce his sentence after he purportedly accepted responsibility for his actions. We address each of Tercier's arguments in turn.

### A. *Gigilo* Violation

We first address Tercier's argument that the government violated *Giglio v. United States* by presenting false testimony regarding the September 26 drug transaction. Under *Giglio*, the government cannot knowingly submit false evidence

8

to the jury. 405 U.S. at 153. "To prevail on a *Giglio* claim, a [defendant] must establish that '(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material—i.e., that there is "any reasonable likelihood" that the false testimony "could . . . have affected the judgment."'" *Ford v. Hall*, 546 F.3d 1326, 1331–32 (11th Cir. 2008) (alteration in original) (quoting *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2008)). When the prosecution "not only fails to correct materially false testimony but also affirmatively capitalizes on it, the defendant's due process rights are violated despite the government's timely disclosure of evidence showing the falsity." *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017).

"Typically, we review such a claim of prosecutorial misconduct *de novo*." *United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017). However, when, as here, a defendant does "not object at trial or otherwise raise the issue" of prosecutorial misconduct "before the district court, such as through a motion for mistrial or for new trial, we review only for plain error." *Id.* Because Tercier did not object at trial, we review his *Giglio* claim only for plain error.

Here, Tercier denies that he participated in the September 26 drug transaction, claiming that the government submitted false evidence to the jury when it claimed Tercier was involved in the hand-to-hand transaction with Lavalliere. To prove that he was not at his autobody shop during the transaction, Tercier identifies what he

contends are contradictory pieces of evidence and policing oversights. Tercier argues that Detective Hernandez and Detective Veloz contradicted themselves when they described the package that contained the drugs—while Detective Hernandez described it as "yellow," Detective Veloz described it as "orangy-brown." Additionally, Tercier argues that Lavalliere could not remember if he dropped off drugs to Tercier at his autobody shop on September 26, that Tercier was never photographed during the transaction, and that no drugs were seized after the transaction. Tercier also specifically points to the Session 612 wiretap conversation, which occurred on September 26, to argue that he could not have been at his autobody shop at 1:19 p.m. During this conversation, Tercier told Lavalliere that he was "right by Walgreens." Because his autobody shop is not near the Walgreens, Tercier contends that this statement proves that he did not participate in the transaction. As the purportedly false evidence was elicited and used throughout trial, Tercier contends that he is entitled to a new trial.[2]

Tercier's arguments as to prosecutorial misconduct concern factual and credibility disputes more properly reserved for a jury in determining guilt or innocence, and in this case, do not support a finding of prosecutorial misconduct.

---

[2] In his reply brief, Tercier presented additional arguments of prosecutorial misconduct. Because new arguments cannot be raised in a reply brief, we decline to consider these arguments. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014) (stating that arguments raised for the first time in a reply brief "come too late").

Mere testimonial inconsistency, "memory lapse, unintentional error, [and] oversight," are insufficient to establish that the government's evidence was perjured. *United States v. Bailey*, 123 F.3d 1381, 1395–96 (11th Cir. 1997); *see also Stein*, 846 F.3d at 1147; *United States v. McNair*, 605 F.3d 1152, 1208–09 (11th Cir. 2010). In other words, such evidence does not demonstrate that the government submitted materially false information to the jury.  *See McNair*, 605 F.3d at 1208–09. Accordingly, Lavalliere's faulty memory, the detectives' "inconsistent" testimony, and general policing oversights do not assist Tercier.  And the Session 612 conversation is similarly unavailing.  The conversation took place at 5:11 p.m.— four hours after the 1:20 p.m. transaction—and the conversation does not even mention the earlier events of that day.  We therefore find that Tercier's *Giglio* arguments do not present a ground to reverse his conviction.[3]

## B. *Batson* Violation

We next turn to Tercier's *Batson* arguments.  In considering a *Batson* claim, our "standard of review of the trial court's factual findings in a *Batson* hearing [is] 'highly deferential.'" *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 479 (2008)).  "A district court's finding as to

---

[3] Tercier also alleges that the government misled the jury when it declined to play Sessions 575 to 620—including Session 612—at trial.  While *Giglio* claims also concern "undisclosed evidence," the recordings of Sessions 575 to 620 were admitted into evidence at trial.  "In the absence of government suppression of the evidence, then, there can be no *Giglio* violation." *Stein*, 846 F.3d at 1150.  Additionally, Tercier had the opportunity to play these sessions at trial if he believed them to be material.

11

why a juror is excused is an issue of fact, and as such, it will not be disturbed on appeal 'unless it is clearly erroneous or appears to have been guided by improper principles of law.'" *United States v. Allen-Brown*, 243 F.3d 1293, 1297 (11th Cir. 2001) (quoting *United States v. Williams*, 936 F.2d 1243, 1246 (11th Cir. 1991)); *accord Flowers*, 139 S. Ct. at 2244).

A *Batson* inquiry consists of three steps. *Batson v. Kentucky*, 476 U.S. 79, 96–98 (1986). First, the defendant has the burden to make out a prima facie case of discrimination. *See Flowers*, 139 S. Ct. at 2241. A defendant may base his prima facia case on race, ethnic, or national-origin discrimination. *See id.* (race); *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1343–47 (11th Cir. 2019) (national origin); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1039 (11th Cir. 2005) (ethnicity). "[T]he defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal." *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990) (quoting *United States v. Young-Bey*, 893 F.2d 178, 179 (8th Cir. 1990)); *see also Flowers*, 139 S. Ct. at 2243 (providing examples of "evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race").

Second, once the defendant has shown a prima facia case of discrimination, the burden shifts to the government to "provide [protected-class-neutral] reasons for its peremptory strikes." *Flowers*, 139 S. Ct. at 2241. "Although there are a number

of bases upon which a prosecutor may desire to strike a juror not excusable for cause, at this step, the prosecutor is required to provide a "'clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.'" *Atwater v. Crosby*, 451 F.3d 799, 806 (11th Cir. 2006) (quoting *Batson*, 476 U.S. at 98 n.20). Indeed, at this step, reasons may be "superstitious, silly, or trivial," so long as they are not protected-class related. *United States v. Walker*, 490 F.3d 1282, 1293 (11th Cir. 2007) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

At the last step, the "trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers*, 139 S. Ct. at 2241. "At this stage, the persuasiveness of the prosecutor's justification for his peremptory strike" is critical. *Atwater*, 451 F.3d at 806. "'[I]mplausible or fantastic justifications' may be found to be pretextual, and in these cases, the question is whether the prosecutor's . . . explanations are credible." *Id.* (alteration in original) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)). "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El*, 537 U.S. at 339. Still, the party challenging the strike carries "the ultimate burden of persuasion." *Purkett*, 514 U.S. at 768.

13

On appeal, Tercier argues that the district court erred when it allowed the government to strike a prospective juror whom he purports was of Haitian descent. Tercier also argues that the district court should have made specific findings regarding his prima facie case and rationale for its decision. We disagree.

Initially, to the extent that Tercier argues that he established a prima facia case of discrimination because the prospective juror was of Haitian ethnicity or national origin based on his race and French-sounding surname, we find Tercier's argument without merit. Here, the record contains no evidence establishing the prospective juror's ethnicity or national origin. Based on this record, "we have no way of knowing whether the government could tell whether the juror[] it struck" was in fact Haitian. *Ochoa-Vasquez*, 428 F.3d at 1043. Indeed, as the record reveals, "the only alternative to identifying the self-reported race or ethnicity of the venire members [would be] to establish it based on appearance, demeanor, accent, and other physical characteristics—thereby emphasizing racial distinctions in jury selection, which our *Batson* jurisprudence seeks to eliminate." *See id.*

Tercier also asserts that the government's rationale for the strike was pretextual and that the district court improperly condensed the second and third *Batson* steps. With regard to the second step of the *Batson* inquiry, the government initially proffered that the prospective juror was too disengaged in the proceedings and too young. After additional questioning, the government admitted that the

14

prospective juror was more attentive than before but still lacked "substantial life experience." Both justifications are permissible. *See Smith*, 924 F.3d at 1347 (holding that a strike based on "youth and lack of participation in voir dire" are permissible justifications); *United States v. Hendrieth*, 922 F.2d 748, 749–50 (11th Cir. 1991) (holding that a strike on a juror who "was inattentive and rubbing and rolling her eyes during voir dire" was permissible).

Finally, as to Tercier's claim that the district court improperly condensed the second and third *Batson* steps, we acknowledge that the district court *might* have condensed the second and third *Batson* steps. *See United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007) (explaining that "the district court improperly condensed the second and third steps of the *Batson* inquiry by summarily overruling [the defendant's] objections and/or failing to consider whether [the defendant] had refuted the race-neutral explanations proffered by the Government"). "Nevertheless, given the great deference afforded to the determinations of trial courts regarding the believability of the [government's] race-neutral explanations for its strikes, we cannot conclude that the district court clearly erred in overruling [Tercier's] *Batson* objections." *See id.* As previously stated, the government articulated permissible reasons for the strike. Moreover, the record evidence shows that the government sought to strike another prospective student juror and that African-Americans were selected as jurors. "Although the presence of African–

15

American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim." *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995). Accordingly, we find that Tercier's *Batson* claim does not present a ground to reverse his conviction.

## C. *Riley* Violation

We now turn to Tercier's argument that the district court erred in admitting evidence obtained from a warrantless search of a third party's cellphone in violation of *Riley v. California*. Even though a third party owned the cellphone, Tercier asserts that he has standing to challenge the search.

As a general matter, "[a] defendant has standing to challenge a warrantless search if the defendant had a 'legitimate expectation of privacy' in the property when it was searched." *United States v. Gibson*, 708 F.3d 1256, 1276 (11th Cir. 2013) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). In *Riley v. California*, the Supreme Court found that a defendant has an expectation of privacy in his personal cellphone contents. 573 U.S. at 403; *see also Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (holding that a defendant has a legitimate expectation of privacy "in the record of his physical movements as captured through" cell-site location information).

However, a defendant "has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S.

16

735, 743–44 (1979).  A defendant therefore cannot benefit from an unconstitutional search of a third party.  *See Rawlings v. Kentucky*, 448 U.S. 98, 103–06 (1980) (holding that a defendant could not benefit from the unconstitutional search of another person's purse); *United States v. Salvucci*, 448 U.S. 83, 84–85 (1980) (holding that a defendant could not benefit from the unconstitutional search of the apartment of his co-defendant's mother); *United States v. Brown*, 743 F.2d 1505, 1507–08 (11th Cir. 1984) (holding that a defendant did not have an expectation of privacy in the person of his co-defendant, who personally carried drugs).

On appeal, Tercier argues that the district court improperly allowed evidence that was obtained from a warrantless search of a third party's cellphone and that he has standing to challenge the search because content from the cellphone was used against him at trial.  Given the applicable principles set forth above, we find that while Tercier would have standing to challenge a warrantless search of his own cellphone, *see Riley*, 573 U.S. at 403, Tercier does not have standing to challenge the cellphone contents of a third party, *see Rakas*, 439 U.S. at 143.  There is no evidence in the record demonstrating that Tercier had an expectation of privacy in the cellphone contents of the third party.  *See id.*  Although the third party's cellphone contained Tercier's phone number, a defendant "has no legitimate expectation of privacy in information he voluntarily turns over to third parties."

17

*Smith*, 442 U.S. at 743–44.  We therefore conclude that Tercier's *Riley* arguments do not present a ground to reverse his conviction.

### D. Jury Instructions

Next, Tercier argues that the district court erred in submitting transcripts of wiretapped conversations to the jury and directing the jury to accept the Creole-to-English transcript translations as accurate.  "The propriety of the trial court's jury instruction is a question of law, which we review *de novo*."  *United States v. Drury*, 396 F.3d 1303, 1313 (11th Cir. 2005).  Unpreserved constitutional arguments are subject to plain error review.  *United States v. Chau,* 426 F.3d 1318, 1321–22 (11th Cir. 2005).

"[T]ranscripts are evidence admissible to aid the jury as it listens to a tape."  *United States v. Costa*, 691 F.2d 1358, 1362–63 (11th Cir. 1982).  When a transcript contains translated text, we require

> the district court and the parties [to] make an effort to produce an 'official' or 'stipulated' transcript, one which satisfies all sides.  If such an 'official' transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions.  In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.

18

*United States v. Wilson,* 578 F.2d 67, 69–70 (5th Cir. 1978).[4]  This procedure "does not tie a defendant to an 'official' transcript prepared by the prosecution, nor does it 'usurp' the factfinder's function."  *United States v. Llinas*, 603 F.2d 506, 510 (5th Cir. 1979).  "When a defendant does not avail himself of this procedure, he 'waive[s] his right to challenge the translation and the transcripts.'"  *United States v. Curbelo*, 726 F.3d 1260, 1271 (11th Cir. 2013) (alteration in original) (quoting *United States v. Cruz*, 765 F.2d 1020, 1023 (11th Cir. 1985)).

Still, translated transcripts may trigger Confrontation Clause issues.  Under the Confrontation Clause, "the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause allows "the admission of 'testimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.'"  *Curbelo*, 726 F.3d at 1272 (alteration in original) (quoting *Crawford v. Washington*, 541 U.S. 36, 59 (2004)).  "Testimonial statements include statements that are the 'functional equivalent' of in-court testimony, such as affidavits, depositions, prior testimony and 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all Fifth Circuit decisions issued before October 1, 1981, as binding precedent.

statement would be available for use at a later trial.'" *Id.* (quoting *Crawford*, 541 U.S. at 51–52).

When an individual who independently reviewed the underlying recordings and transcripts for accuracy is subject to cross-examination, however, the Confrontation Clause is not violated. *See id.* at 1276. Indeed, the Confrontation Clause does not require "that anyone whose testimony may be relevant in establishing the chain of custody . . . must appear in person as part of the prosecution's case." *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009).

Tercier argues that the district erred when it instructed the jury to accept the Creole-to-English translated wiretap conversation transcripts as true. Tercier asserts that the given instruction invaded the fact-finding role of the jury and tangentially argues that this instruction violated the Confrontation Clause because the government did not offer the transcript translators as witnesses.

We disagree with Tercier's contentions. Importantly, Tercier never objected to the wiretap transcript translations at trial and did not offer his own version of the translations. *See Wilson,* 578 F.2d at 69–70. Because Tercier stipulated to their introduction at trial, he "cannot complain on appeal that the jury's fact-finding function was usurped when he failed to present evidence which would have aided the jurors in fulfilling that function." *See Llinas*, 603 F.2d at 510. Although Tercier

20

now complains that the jury instructions "encroache[d] on the jury's responsibility," Tercier was "granted access to the transcripts before trial and [was] offered the opportunity to present alternative transcripts.  [He] chose not to do so."  *United States v. Nixon*, 918 F.2d 895, 901–02 (11th Cir. 1990).  Since the accuracy of the translated transcripts was never an issue at trial, the district court's jury instructions were proper.

Furthermore, the district court properly instructed the jury to use the transcripts for a limited purpose.  *See United States v. Onori*, 535 F.2d 938, 947–48 (5th Cir. 1976).  The transcripts were to be used as an aid when the jury reviewed the wiretap recordings, which the district court described as the primary evidence. The district court also properly instructed the jury to determine whether the English language conversations and speaker identifications were accurate.  *Cf. Nixon*, 918 F.2d at 901–02; *United States v. Rosenthal*, 793 F.2d 1214, 1238 (11th Cir. 1986).

Tercier's Confrontation Clause arguments are similarly unavailing.  While the government did not proffer its translators as witnesses, primarily because Tercier did not contest the accuracy of the translations, it offered Special Agent Weber as a witness, who testified to the translation verification process and the transcript's accuracy.  Because the Confrontation Clause "only insists that testimony be subject to cross-examination" and Special Agent Weber was cross-examined, the

21

Confrontation Clause was not violated.  *See Curbelo*, 726 F.3d at 1276.  Tercier's

arguments therefore do not present a ground to reverse his conviction.

### E.  Evidentiary Issues

Tercier also raises four evidentiary issues, arguing that the district court erred

when it allowed: (1) government witnesses to recount the "real time" present sense

impressions of surveilling agents during the September 26 transaction, in violation

of the Confrontation Clause; (2) Duroseau to opine on the coded conversations

between Tercier and Lavalliere; (3) Special Agent Mayo, the government's sole

expert witness, to opine on the coded conversations; and (4) the government to

purportedly bolster its witness.  As a result, Tercier argues that the district court

committed cumulative error.

"[A] district court's evidentiary rulings are reviewed for abuse of discretion.  .

. . [If] the defendant failed to preserve his challenge to an evidentiary ruling by

contemporaneously objecting, our review is for plain error."  *Edouard*, 485 F.3d at

1343 (citation omitted).    "Further, we must review the prejudicial effect

of *all* evidentiary errors, evaluated under both preserved and plain error standards,

in the aggregate.  We will therefore reverse if the cumulative effect of the errors is

prejudicial, even if the prejudice caused by each individual error was harmless."

*United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005) (emphasis in original)

(footnote omitted) (citation omitted), *abrogated on other grounds by Davis v.*

*Washington*, 547 U.S. 813, 821 (2006).  Additionally, unpreserved constitutional arguments are subject to plain error review.  *Chau,* 426 F.3d at 1321–22.  We discuss each argument in turn.

### i.   Present Sense Impression and Confrontation Clause

Tercier argues that the district court erred when it permitted the government witnesses to recount the "real time" present sense impressions of surveilling agents during the September 26 transaction.  Under Federal Rule of Evidence 803(1), a present sense impression is a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." "[T]he statement describing or explaining the event or condition must be made while the declarant was perceiving the event or condition or immediately thereafter. The underlying theory of this exception is that the 'substantial contemporaneity of the event and the statement negate the likelihood of deliberate or conscious misrepresentation.'" *United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987) (quoting *United States v. Peacock*, 654 F.2d 339, 350 (5th Cir. 1981)).

As discussed above, a Confrontation Clause violation occurs when a defendant did not have an opportunity to cross-examine an unavailable witness. *Crawford*, 541 U.S. at 51–59.  The Supreme Court has stated that "[a] witness's testimony against a defendant is thus inadmissible unless *the witness appears at trial*

23

or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz*, 557 U.S. at 309 (emphasis added).

Tercier identifies three instances where the district court overruled his present sense impression objections. First, Detective Hernandez described what Task Force Officer Corley told him over the radio, in real time, when Officer Corley drove by Lavalliere's house on September 26. Second, Detective Hernandez described what Detective Veloz told him over the radio, in real time, when Detective Veloz surveilled Tercier's autobody shop. And third, Detective Veloz described what Detective Hernandez told him over the radio, in real time, when Detective Veloz surveilled Lavalliere's movements. Tercier argues that the present sense impression hearsay exception does not apply because the witnesses were describing the out-of-court statements of the surveilling agents. Tercier also notes that these statements are testimonial and therefore violate the Confrontation Clause.

We disagree, as these underlying statements are admissible under the present sense impression exception. In *United States v. Pierce*, this Court held that the tape-recorded statements of a surveillance officer, who recorded his impressions "of what he saw" when he saw them, were present sense impressions. 765 F.2d 1491, 1501 (11th Cir. 1985). "Although the statements may have been hearsay recorded out of the presence of the defendants, they fall clearly within the exception for present sense impressions, which are admissible on the ground that 'the substantial

24

contemporaneity of the event and statement negates the likelihood of deliberate or conscious misrepresentation.'" *Id.* (quoting *Peacock*, 654 F.2d at 350).

Similarly here, the statements of the surveilling agents concerning events as they witnessed them were relayed simultaneously to the government witnesses and, therefore, the testimony was admissible under the present sense impression exception. *Cf. United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir. 1995) ("The surveillance officers were providing a description of the events at the same time they were witnessing them, so the testimony was admissible under the present sense impression exception.").

Additionally, these statements do not violate the Confrontation Clause. Even if these statements were testimonial, both Detective Hernandez and Detective Veloz testified at trial and were subject to cross-examination. Although Officer Corley did not testify at trial, he was present at trial and available to testify. Since Detective Hernandez, Detective Veloz, and Officer Corley were available for cross-examination, no Confrontation Clause issue exists. *See Melendez-Diaz*, 557 U.S. at 309. We therefore find that the district court did not err in allowing these statements at trial.

ii. Lay Opinion

We now turn to Tercier's lay opinion arguments. Tercier argues that the district court should not have allowed Duroseau to opine on the coded conversations

25

between Tercier and Lavalliere.  Specifically, Tercier asserts that Duroseau cannot opine on conversations in which he did not participate and characterizes Duroseau's answers as hedged and caged.  These arguments are without merit.

Under Federal Rule of Evidence 701, a lay witness may offer an opinion that is (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"—the expert witness rule.  "[A] witness may clarify conversations that are 'abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that [were] clear only to the [defendant] and [the witness].'"  *United States v. Rivera*, 780 F.3d 1084, 1094 (11th Cir. 2015) (alterations in original) (quoting *United States v. Awan,* 966 F.2d 1415, 1430 (11th Cir. 1992)).

In support of his argument, Tercier relies on *United States v. Rivera*.  Tercier's reliance on *Rivera* is misplaced.  Lay testimony is properly permitted when it is "rationally based on . . . perception, first-hand knowledge, and observation," and "helpful to the jury."  *Id.* at 1095. Here, as in *Rivera*, Duroseau's testimony was rationally based on his perception, first-hand knowledge, and observation of his previous conversations with his co-conspirators and was therefore helpful to the jury to determine the nature of the coded conversations.  Additionally, "[w]e have never

26

held that a lay witness must be a participant or observer of a conversation to provide testimony about the meaning of coded language used in the conversation." *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011) (collecting cases).

While Tercier takes issue with what he characterizes as Duroseau's hedged answers, Tercier's arguments regarding Duroseau's "perceptions," and "the accuracy of those perceptions" is "a question for the jury" to decide. *See Rivera*, 780 F.3d at 1094 (quoting *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986)). We therefore find that the district court did not err in allowing this testimony at trial.

### iii. Expert Opinion

We next address Tercier's arguments regarding expert opinion testimony. Under Federal Rule of Evidence 702, a district court may allow an expert to opine on a subject matter when:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Narcotics officers may expertly opine on wiretapped conversations that contain coded language when the officers have "extensive involvement in [the underlying] investigation, . . . experience in previous wiretaps, . . . and general investigative experience." *United States v. Holt*, 777 F.3d 1234, 1265 (11th Cir.

27

2015).  However, a district court may exclude this testimony "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or *needlessly presenting cumulative evidence*."  Fed. R. Evid. 403 (emphasis added).  This is "an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence.  In criminal trials, relevant evidence is inherently prejudicial.  [Thus, t]he rule permits exclusion only when unfair prejudice substantially outweighs probative value."  *United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008) (alteration in original) (quoting *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir. 1984)).

Tercier argues that the district court should not have allowed Special Agent Mayo to opine on Tercier and Lavalliere's conversations because Special Agent Mayo's testimony was cumulative.  In support of his argument, Tercier relies on the fact that Lavalliere had previously testified on two separate days regarding the coded conversations between Tercier and himself.

We find Tercier's argument without merit.  Initially, we note that neither Rule 702 nor case law require an expert to be a participant in a conversation to offer an opinion.  *See* Fed. R. Evid. 702; *Holt*, 777 F.3d at 1265.  And it is telling that Tercier did not object to Special Agent Mayo being tendered as an expert witness.  Special Agent Mayo properly opined on the coded conversations because he has

28

approximately thirteen to fourteen years' worth of experience working on narcotics cases, has worked on over twenty wiretaps, and has monitored and investigated the wiretaps produced at trial.

Moreover, Special Agent Mayo's testimony, which opined on the wiretap recordings, was not cumulative. He was the only expert witness who opined on the coded conversations. As Tercier notes, Lavalliere also opined on these conversations. But Tercier neglects to mention that Lavalliere was also heavily cross-examined. To prove that the coded language referenced cocaine, the government tendered Special Agent Mayo as an expert witness. As such, we conclude that under Federal Rule of Evidence 702, this evidence was not "needless" and that the district court did not err in allowing this testimony at trial.

iv. Witness Bolstering

Tercier's last claim of evidentiary error concerns witness bolstering. "Impermissible vouching occurs when a prosecutor indicates his personal belief in a witness's credibility, either by 'making explicit personal assurances' of the witness's veracity or 'by indicating that information not presented to the jury supports the testimony.'" *United States v. Hesser*, 800 F.3d 1310, 1328 (11th Cir. 2015) (quoting *United States v. Sims*, 719 F.2d 375, 377 (11th Cir. 1983)). For example, a prosecutor engages in improper bolstering when he vouches for the veracity of a government witness in his closing argument. Importantly, bolstering

"reaches only the prosecutor's conduct and does not apply to government witnesses." *United States v. Sanchez*, 790 F.2d 1561, 1564 (11th Cir. 1986). As such, when a prosecution witness testifies that another government witness is truthful, that conduct only touches the witness's—and not the prosecution's—conduct. *Id.*

Here, Tercier points to a question directed at Special Agent Weber during redirect. The government asked Special Agent Weber, "[d]id you have any evidence that [Lavalliere] was not being truthful regarding the statements he made during those interviews?" Since Special Agent Weber answered in the negative, Tercier argues that the government improperly placed the prestige of the government behind its witness and improperly bolstered Lavalliere.

We disagree. Because Special Agent Weber, and not the government, stated that Lavalliere was credible, Special Agent Weber, and not the government, "vouched for the veracity of a pivotal government witness." *See United States v. Newton*, 44 F.3d 913, 920 (11th Cir. 1994). We find the decision of *United States v. Sanchez* instructive on this issue. In that case, the defendant argued that the government improperly bolstered the government's witness. 790 F.2d at 1564. The issue "arose when [the defendant] cross-examined a DEA agent about [the government witness's] suitability for federal investigative work. On redirect examination, the agent testified that other DEA agents had worked with [the witness]

30

in prior investigations and found him reliable." *Id.* This Court held that the government had not impermissibly bolstered the witness's testimony, explaining that the "prohibition of bolstering witness credibility reaches only the prosecutor's conduct and does not apply to government witnesses." *Id.* Furthermore, "the purpose of this testimony was not to bolster [the witness's] credibility, but to justify the DEA's decision to employ him. [The defendant] first called attention to the matter on cross examination and the government was entitled to respond to it." *Id.*

Similarly here, the "purpose of this testimony was not to bolster [Lavalliere's] credibility, but to justify the [government's] decision to" rely on him. *See id.* Moreover, Tercier "first called attention to the matter on cross examination and the government was entitled to respond to it." *See id.* We therefore find that the district court did not err in allowing the testimony.

### v. Cumulative Error

Where there is no error as to any of the defendant's individual claims of evidentiary error, there can be no cumulative error. *See Morris v. Sec'y, Dept. of Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012); *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011). Because Tercier has not established a single evidentiary error by the district court, his claim of cumulative error fails as well.

### F. Sentence Adjustment

31

Finally, we address Tercier's challenge to his sentence. Tercier argues that the district court erred in determining that he was not entitled to a two-level reduction in his offense level for acceptance of responsibility. Specifically, Tercier contends that he was entitled to an adjustment for acceptance of responsibility because he only went to trial to contest the amount of cocaine attributed to him. Tercier also asserts that because the district court accorded him safety-valve relief, it should have also afforded him an acceptance-of-responsibility adjustment.

We review denials of acceptance-of-responsibility adjustments for clear error. *United States v. Amedeo*, 370 F.3d 1305, 1320 (11th Cir. 2004). A district court may decrease a defendant's "offense level by [two] levels" when he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The Federal Sentencing Guidelines note that an adjustment "is *not* intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* § 3E1.1 cmt. n.2 (emphasis added). Additionally:

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.*g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.*; *accord United States v. Spoerke*, 568 F.3d 1236, 1252 (11th Cir. 2009).

In determining whether a defendant is entitled to receive a reduction for acceptance of responsibility, a district court may consider whether the defendant (1) "truthfully admitted the conduct comprising the offense of conviction," (2) voluntarily withdrew or terminated the criminal conduct, and (3) made a timely acceptance of responsibility. *United States v. Wade*, 458 F.3d 1273, 1279 (11th Cir. 2006). Importantly, a district court is afforded great deference in making this determination. U.S.S.G. § 3E1.1 cmt. n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review."); *accord United States v. Tejas*, 868 F.3d 1242, 1247 (11th Cir. 2017). Unless a case represents a rare or "unusual" situation, a district court's determination will stand. *See, e.g.*, *United States v. Barner*, 572 F.3d 1239, 1251–52 (11th Cir. 2009).

A district court's discretion to decrease a defendant's sentence based on a defendant's acceptance of responsibility, however, is not to be confused with what is known as granting "safety-valve relief." *See United States v. Brownlee*, 204 F.3d 1302, 1304–05 (11th Cir. 2000) (explaining safety-valve relief). Safety-valve relief enables a district court to "impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence" if five criteria are met. U.S.S.G. § 5C1.2(a). The criteria include whether "the offense did not result

in death or serious bodily injury to any person," whether "the defendant was not an organizer, leader, manager, or supervisor of others in the offense," and whether "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses" no "later than the time of the sentencing hearing."  U.S.S.G. § 5C1.2(a)(3)-(5).

Here, Tercier "put[] the government to its burden of proof at trial by denying the essential factual elements of guilt, [was] convicted, and only [now] admits guilt and expresses remorse."  U.S.S.G. § 3E1.1(a) cmt n.2.  Indeed, a review of the record shows that Tercier did not solely contest the quantity of drugs.  In his opening statement, closing argument, and motion for acquittal, Tercier denied that he participated in a drug trafficking conspiracy and he vigorously cross-examined government witnesses.  Tercier never admitted guilt or accepted responsibility for his actions until after he was convicted.  In other words, Tercier denied "the essential factual elements of guilt" even after conviction.  *See id.*

Additionally, granting safety-valve relief does not necessitate granting an acceptance-of-responsibility adjustment.  Safety-valve relief concerns, in part, whether a defendant "truthfully provided to the [g]overnment all information and evidence the defendant has concerning the offense or offenses" no "later than the time of the sentencing hearing."  U.S.S.G. § 5C1.2(a)(5).  According to the district court, Tercier satisfied this requirement.  Specifically, although Tercier had

34

previously given the government false information during and after his arrest, and was not entirely truthful in his January 29, 2018, statement for eligibility for safety-valve relief, the district court was satisfied that Tercier provided truthful information during the sentencing hearing. By comparison, the acceptance-of-responsibility adjustment considers the timeliness of an admission of responsibility and whether a defendant accepted responsibility for his actions before trial. U.S.S.G. § 3E1.1(a). As discussed above, Tercier did not satisfy this requirement. Accordingly, we find that the district court did not clearly err in denying Tercier an adjustment for acceptance of responsibility, and we affirm Tercier's sentence.

## III.    CONCLUSION

Having examined each of Tercier's arguments on appeal, and for the reasons stated above, we conclude that no error has been shown. Accordingly, we affirm Tercier's conviction and sentence for conspiring to possess with intent to distribute five kilograms or more of cocaine.

**AFFIRMED.**